DAVID B. DISTER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Dister v. Commissioner
Docket Nos. 1111-84, 16842-84, 4462-85, 4463-85.
United States Tax Court
T.C. Memo 1987-217; 1987 Tax Ct. Memo LEXIS 221; 53 T.C.M. (CCH) 694; T.C.M. (RIA) 87217; April 29, 1987. Robert T. Gilleran, for the petitioners. Karl D. Zufelt, for the respondent. SHIELDS
SHIELDS, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Docket
Addition to Tax
Petitioner
Number
Year
Deficiency
Section 6653(a) [2]
David B. Dister
1111-84
1981
$9,158
$457.90 plus
50% of interest
on underpayment
of $9,158
David G. and
16842-84
1980
26,294
Pamela C. Collins
Anne K. Hamsley
4462-85
1981
6,831
$341.55 plus
50% of interest
on underpayment
of $6,831
Bernie D., Jr. and
4463-85
1981
35,137
$1,756.85 plus
Maureen K. Gates
50% of interest
on underpayment
of $35,137
The issues for *223 decision are: (1) whether petitioners' mining activities lacked economic substance and were undertaken for the principal purpose of avoiding tax; (2) whether tests of the mineral aggregates in which petitioners acquired interests had disclosed the existence of ores or minerals in comercially marketable quantities; (3) whether petitioners are limited to deducting expenses actually paid in cash during the years in issue; (4) whether petitioners' amounts-at-risk in the mining activity are limited to petitioners' cash payments during the years at issue; and (5) whether petitioners Dister, Hamsley, and Gates are liable for the addition to tax for negligence under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioner David Dister (Dister) resided in Missouri at the time he filed his petition. During 1981, he was a producer and director of industrial motion pictures. Petitioners David D. and Pamela C. Collins, husband and wife, resided in California at the time they filed their petition. During 1980, David D. Collins ("Collins") was in the construction *224 business. Petitioner Anne K. Hamsley (Hamsley) resided in California at the time she filed her petition. During 1981, she was an office manager. Petitioners Bernie D. Gates and Maureen K. Gates, husband and wife, resided in California at the time they filed their petition. During 1981, Bernie D. Gates ("Gates") was an airline pilot. Background of Mining Venture
In 1981, Dister, Hamsley, and Gates participated in a gold mining venture which had been started in 1980 by the Alaskan Mining & Processing Corporation, Ltd. ("AMP"), Lords Mine, Inc. ("Lords Mine"), and Cape Yakataga Mines, Ltd. ("CY"). Collins participated in the same venture in 1980. AMP, a California corporation, was purportedly organized for the purpose of conducting a gold mining business. At all relevant times it was under the supervision and control of Brian Grattan, who first entered the mining business in 1980. Lords Mine, a corporation, and CY, a partnership, also were purportedly in the business of mining gold during 1980 and 1981. At all relevant times they were under the supervision and control of Dean Garren. The mining venture involved in these consolidated cases commenced in 1980, when Lords *225 Mine bought three and CY bought two mineral claims [3] situated on the beach at Cape Yakataga, Alaska. Basically the venture consisted of an offer by Lords Mine or CY to sell to a prospective purchaser a specified number of cubic yards of gold bearing aggregate in return for an amount of cash and 60 percent of the net profits realized from mining the aggregate. [4]
Contemporaneously with a purchase of aggregate, the purchaser was required to enter into a mining agreement with AMP under which AMP agreed to mine the aggregate, and the purchaser agreed to pay AMP a specified fee represented in part by cash and the balance by a "recourse" note payable with interest in ten years to Columbia Financial Corporation ("Columbia"). [5]
The venture was promoted by AMP with prospectuses that were distributed *226 to prospective purchasers. A different prospectuses was used for each of the years 1980 and 1981, but they contained almost identical information. A substantial portion of each prospectus was devoted to emphasizing the alleged tax advantages of the venture as outlined in an opinion letter. Each prospectus also included a two-page section entitled "Playing the Tax Shelter Game" which contained the following statement. Even when a deduction is disallowed, the investor may have had the chance to invest the initial cash generated by the tax shelter to produce an after-tax benefit that will equal or exceed the after-tax cost of the disallowed taxes, plus any interest that must be paid. This section also contained an analysis of the odds of the tax return of a purchaser being audited. It concluded that the chance of being audited and losing a tax-shelter write-off was only 14 percent. The 1980 prospectus stated "The TAX WRITE-OFF for 1980 is 4 to 1. Four times cash outlay." It also contained a tabular summary of the amount of tax write-off which could be generated by different payments and a series of questions and answers which explained how a "4 to 1" write-off worked and how *227 to calculate the number of cubic yards which had to be purchased in order to obtain a desired write-off. The prospectus contained the further statement that: Certain purchasers may need an increased leverage to solve their tax problems. If so, they may elect to take a write-off of 5 to 1, 6 to 1, or 7 to 1. This will apply only to those who will develop 12,000 cubic yards of aggregate or more. Authorization to take this additional leverage must be obtained * * * by telephone or in writing. The 1981 prospectus stated that the tax write-off for 1981 was 5 to 1 and in all other respects contained virtually the same information as that described above with respect to 1980. Each prospectus also included a computation of the net income estimated to be recoverable from a purchase of 8,000 cubic yards of aggregate. By assuming $35.00 of gold per cubic yard, the 1980 prospectus estimated net income of $88,000 from a $60,000 investment. [6] The 1981 prospectus estimated a net income of $82,400 from a $74,000 investment. *228 The assumption that $35.00 of gold could be recovered from each cubic yard of aggregate was based on an assay report [7] dated April 1979. It listed the results of tests made on three samples of aggregate purportedly taken from the three claims owned by Lords Mine. The assay report did not reflect the location from which the samples were taken, the method used to recover the samples, or the method used in making the tests. According to the report, the three samples indicated gold in the amounts of $10.23, $32.40 and $147.70 per cubic yard. In addition to the assay report of April 1979 which appeared in both prospectus, the 1980 prospectus contained an assay certificate dated October 1977, [8] and the 1981 prospectus included a "Laboratory Analysis Report" dated December 1980 and a letter from the State of Alaska dated November 1980. Each of these documents listed the gold content of samples purportedly taken from the claims by Lord Mines and CY. The stated results ranged from $18.00 to $73.00 per cubic yard of aggregate. *229 The remainder of each prospectus consisted of resumes of AMP's principals and miscellaneous items such as articles written about Cape Yakataga and its gold-bearing beaches. [9]. Purchases By Petitioners
Dister first learned of the venture from Paul Clark, his accountant. Before making his purchase, he read the 1981 prospectus, but made no inquiry with regard to the experience or reputation of AMP, Lord Mines, Cy, or their principals and made no attempt to determine whether the mining costs included in his contract with AMP were reasonable. Instead, Dister relied completely on Clark, who had no experience in the mining business and who received a commission from AMP upon the sale to Dister. Dister purchased 4,000 cubic yards of aggregate from CY in June 1981 for $150.00 plus 60 percent of his net profits from the aggregate. At the same time, he entered into a mining agreement with AMP under which he paid AMP $5,000 in cash and executed a $20,000 note in favor of Columbia. *230 Like all other petitioners, Dister did not choose the location of his aggregate. The location of the aggregate purchased by each petitioner was chosen by the seller. Petitioners were notified of the selections after their purchases were made. Collins heard about the venture from Don Norling, an investment broker. He read the 1980 prospectus, but did nothing further to determine the value of his aggregate or the reputation and experience of the parties involved in the venture. He delegated all such responsibilities to Norling, even though he knew that Norling had no experience in the mining industry. Collins purchased 12,000 cubic yards of aggregate from Lords Mine in December 1980 for $250.00 plus 60 percent of his net profits from the aggregate. Collins also executed a mining agreement with AMP under which he agreed to pay AMP $15,000 in cash and to execute a $60,000 note payable to Columbia. His total price of $75,000 for 12,000 cubic yards of aggregate was $15,000 more than the charges listed in the 1980 prospectus. Hamsley was the office manager at AMP during 1980 and 1981 and became familiar with the venture through her job. Unlike the other petitioners, she had the *231 opportunity to meet some of the parties involved in the venture, including John O'Grady, an independent contractor hired by AMP to do some of the mining. However, she did not discuss the venture with any unrelated party and made no attempt to determine whether the mining costs she was agreeing to pay were reasonable. Hamsley purchased 4,000 cubic yards of aggregate from CY in August 1981 for $150.00 plus 60 percent of her net profits from the aggregate. At the same time she entered into a mining agreement with AMP under which she agreed to make a $5,000 down payment and to execute a $20,000 note payable to Columbia. However, AMP advanced the $5,000 down payment for her. Gates first learned of the venture in a telephone call from an investment broker in San Diego. The broker also sent him a 1981 prospectus. Gates reviewed the prospectus and then met with the broker. Although he made a few telephone calls about the venture, Gates generally relied upon the investment broker to do any investigation concerning its value or the reputation and experience of its promoters. Gates purchased 12,000 cubic yards of aggregate from CY in September 1981 for $450.00 plus 60 percent of his *232 net profit. Pursuant to the mining agreement which he simultaneously entered into, Gates paid AMP $15,000 in cash and signed a $60,000 note payable to Columbia. In the years between the date of their purchases and the date of trial, none of petitioners had made any of the annual interest payments required under the notes payable to Columbia. Results of the Venture
AMP's mining efforts at Cape Yakataga occurred in two stages. In 1981, AMP hired John O'Grady to design, build and test a machine to recover and process the aggregate. O'Grady and a crew of 31 men went to Cape Yakataga in September 1981 and spent the next four months attempting to build and evaluate such a machine. However, before they had proceeded beyond the evaluation stage of the project, O'Grady and his crew were replaced by Martin Saad and a crew of five to eight men who worked from June until December 1982 attempting to build a plant to process the aggregate, but before the plant was completed AMP ceased all activities at Cape Yakataga. AMP's activities during 1981 and 1982 produced an insignificant amount of gold, and none of petitioners ever received any gold or other return from their rights in the *233 aggregate. About the middle of 1985, petitioners transferred their rights in the aggregate to Petro-Gulf, Inc., an Alaskan corporation, in exchange for stock in Alaskagold Mines, Inc. ("Alaskagold"). Alaskagold, a new Canadian corporation, had been organized to acquire adjacent claims at Cape Yakataga. Petro-Gulf was its major shareholder. In an agreement between petitioners and Petro-Gulf, petitioners are not entitled to receive their stock in Alaskagold until they have paid their notes to Columbia. Petitioners' Returns
For the year in which they purchased aggregate, each petitioner claimed business deductions on Schedule C of his or her income tax return as follows: Dister:
Rent on business property
$ 150.00
Mine development
25,000.00
$25,150.00
Collins:
Mine development expense
$75,000.00
Hamsley:
Mining and processing
$25,000.00
Right to mine
150.00
$25,150.00
Gates:
Mining development expense
$75,000.00
In separate notices of deficiency, respondent disallowed the deductions for mining expenses in full on several alternative grounds, including the contention that petitioners' mining activities were not engaged *234 in for profit and lacked economic substance. [10]
OPINION I. Deductions for Mining Expenses
Under section 616(a) there shall be allowed as a deduction any expenditure paid or incurred during the taxable year for the development of a mine or other natural deposit if the expenditure was paid or incurred after the existence of minerals in commercially marketable quantities had been disclosed. See, e.g., Thomas v. Commissioner,84 T.C. 1244, 1268 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). However, for the deduction to be allowable under section 616(a) the activity giving rise to the expenditure has to constitute an activity engaged in by the taxpayer with the primary purpose and objective of making a profit. Thomas v.Commissioner,84 T.C. at 1269. We recently held, in Rose v. Commissioner, 88 T.C.     (February 5, 1987), that in the case of a "generic tax shelter, *235 " the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance. In Rose we defined a generic tax shelter as being any promotion involving the following characteristics: (1) tax benefits are the principal focus of the promotional materials; (2) the price and terms of purchase are accepted by the investors with little or no negotiation; (3) the asset in question consists of a package of purported rights, difficult to value in the abstract and substantially overvalued in relation to any tangible property included in the package; (4) any tangible property is acquired or created at a relatively small cost shortly prior to the transaction in question; and (5) the bulk of the consideration is deferred by promissory notes, nonrecourse in form or substance. 88 T.C. at     (slip opinion at p. 40). In the case before us, petitioners' investments in the mining venture involved, at least to some extent, all of the above characteristics. Consequently, we must determine whether there was economic substance in petitioners' transactions, and in making *236 such determination, we need to consider the objective factors found to be relevant in cases decided under section 183, as well as the concepts underlying sections 38, 162, 167, and 212. Rose v. Commissioner, 88 T.C. at     (slip opinion at p. 44). We will consider, therefore, whether the dealings between the parties to the transaction tend to show a profit objective on the part of petitioners, the relationship between the amounts paid by petitioners to the fair market value of their investments, and the structure of the financing used in the transactions. A. Dealings Between AMP, Lord's Mine, CY Ltd. and Petitioners
For the reasons set forth below, we are convinced that the dealings between AMP, Lord's Mine, CY, and petitioners clearly evidence a complete lack of actual profit objective on the part of petitioners. First, petitioners made no serious attempt to determine whether the revenues from their aggregate would be sufficient to cover their down payments and pay off their notes. Each petitioner merely read the one-page income projection set forth in the prospectus and accepted it at face value. With the possible exception of Hamsley, none of petitioners knew *237 anything about AMP, which prepared the prospectus, or Lord Mines, CY, or any other party involved, such as the authors of the assays. Furthermore, petitioners knew nothing and made no effort to learn anything about mining or the circumstances surrounding the preparation of the assay reports. In sum, on this record we cannot find that petitioners were justified in accepting the income projections. Instead, from the record before us it is apparent that they showed a complete indifference to the validity of the projections. In fact, petitioners demonstrated no particular interest in any detail of the venture except the tax write-offs. As outlined above they did not investigate the two companies that were selling the aggregate or of the company that was to mine the aggregate, and they made no attempt to determine whether the amounts being charged by those companies were reasonable. Further support for our finding that petitioners were not motivated by potential profit appears from a comparison of the minimal attention given to the profit projections in the prospectuses as compared to the amount of space and attention given to the alleged tax advantages, such as how a purchase would *238 result in a 4 to 1 or 5 to 1 tax write-off, and the statement that even higher leverages were possible by special arrangement with the promoter. In this connection it is noted that Collins obtained additional leverage apparently by merely agreeing to pay $15,000 more than the amounts used in the projections. Petitioners' actions after their purchases also demonstrate their indifference to the success of the venture since the record contains no evidence that they attempted in any way to insure that their aggregate was being mined or that their cash down payments were being properly applied to mining activities even though they never received any benefit from their investments except the possibility of deductible losses. B. Relationship Between Cost and Fair Market Value
From this record, we are unable to conclude that the payments which petitioners agreed to make equal or exceed the approximate fair market value of their investments. In other words, the record contains no convincing proof that the income from their interests in the venture would have been sufficient to recoup their cash down payments and pay off their notes. In this regard, petitioners rely on the projections *239 set forth in the prospectuses as proof of the potential income from the venture. However, these projections are based upon the assumption that each cubic yard of aggregate would produce an average of $35.00 in gold. This assumption in turn is based upon the assay report of April 1979, the assay certificate of October 1977, and the laboratory report and letter from the State of Alaska of November and December 1980. Petitioners, however, presented no proof that the conclusions appearing in these documents were valid, and although the record contains testimony by several witnesses who were familiar with the mining industry there is a conspicuous absence of testimony by anyone having personal knowledge of the manner in which the various samples and tests were made. Thus, we are unable to conclude that the projections based upon the assay report and other documents constitute any basis for a showing that there was a profit potential in these cases. Petitioners also rely on the testimony of Edward Bohn, a senior geologist for Union Mines of Denver, Colorado. In 1977 and 1978, Mr. Bohn visited Cape Yakataga on several occasions on behalf of Union Mines and another mining company and *240 took samples of aggregate from its claims. He testified that, based on these samples, he believed that the gold at Cape Yakataga could be "economically recovered." Even if we adopt this statement as being true with respect to the claims in which petitioners had an interest, it does not constitute proof that there were sufficient quantities of gold in their aggregate to provide a profitable return to petitioners inasmuch as they had agreed to pay Lords Mine and CY 60 percent of their net profits. Petitioners also produced an expert report prepared by W.D. Groves in 1978 for a Canadian mining company. This report concerned preliminary tests run by Groves on samples taken from other claims at Cape Yakataga. Groves concluded that a cubic yard of aggregate from the beach area at Cape Yakataga would yield, in Canadian dollars, an average of $2.35 to $2.80 of recoverable gold, using a price of $200.00 per ounce. Here again petitioners offered no proof as to how Graves' preliminary tests on samples taken from other claims were an indication that petitioners could recover even the amount of their investments. C. Structure of the Financing
The presence of deferred debt which is *241 non-recourse or is otherwise not likely to be paid is an indicia of lack, or exaggeration, of economic substance. Rose v. Commissioner, 88 T.C. at     (slip opinion at p. 51). In this case, petitioners paid the bulk of the mining fees with a "recourse" note given to Columbia, a corporation about which petitioners knew nothing. Petitioners never made any payments of principal or interest on their notes and the record contains no evidence that Columbia ever requested any such payments. It appears therefore that the notes to Columbia were merely paper transactions, since there is no convincing evidence that Columbia ever advanced any funds to AMP or arranged any such financing. From all of the above analysis, we are satisfied that petitioners' activities with respect to their interest in the claims were devoid of economic substance and, thus, are not sufficient to support their deductions under section 616, or any other section which is dependent upon a profit objective. [11]
II. Negligence
Respondent has determined additions to tax for negligence *242 under section 6653(a)(1) and (2) against Dister, Hamsley, and Gates. In defense to the claim of negligence these petitioners first contend that they relied on the opinion letter found in the prospectuses. However, this contention is inapposite because the opinion letter was addressed to Brian Grattan of AMP and not to petitioners. Furthermore the letter clearly stated that it should not be relied upon as a legal opinion by anyone other than Grattan and that any prospective purchaser should obtain independent legal advice. Dister, Hamsley and Gates also contend that they were not negligent because they relied upon the advice of their tax return preparers. Generally speaking, however, a taxpayer cannot avoid the responsibility of filing accurate income tax returns by relying upon an agent. Bailey v. Commissioner,21 T.C. 678 (1954). Nevertheless, where a taxpayer has established that he relied in good faith upon the advice of a competent accountant, experienced in tax matters, to claim a deduction on his return, we have held that the addition to tax under section 6653(a) is not applicable. See, e.g., Conlorez Corp. v. Commissioner,51 T.C. 467, 474 (1968); *243 Woodbury v. Commissioner,49 T.C. 180, 199-200 (1967). However, the record before us contains no evidence of the competency of the return preparers involved in these cases or of the care exercised by petitioners in selecting the preparers. Consequently, we are unable to find that they relied in good faith upon any advice from the preparers. Therefore, the additions to tax determined by respondent under section 6653(a)(1) and (2) are sustained. A decision will be entered for respondent in each docket.
Footnotes
1. Cases of the following petitioners are consolidated herewith: David G. Collins and Pamela C. Collins, docket No. 16842-84; Anne K. Hamsley, docket No. 4462-85; and Bernie D. Gates, Jr. and Maureen Kilty Gates, docket NO. 4463-85.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, during the year in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. For our purposes, "claim" refers to an area of land staked out by a prospector. ↩
4. The aggregate was actually beach sand and the underlying material located on one of the five claims at Cape Yakataga.↩
5. Petitioners claim that Columbia arranged the financing for the venture, but we were unable to find any credible evidence that Columbia even existed, much less provided financing.↩
6. The computation for 1980 is set out below: ↩
8,000 cubic yards at $35.00 per cubic yard
$280,000
Less: Cash Down Payment
$10,000
Note
30,000
Interest (estimated - 4 yrs.)
12,000
Mineral Extraction (Proc)
8,000
60,000
$220,000
Less: Override royalty to Lord's Mine.
132,000
ESTIMATED INCOME IN GOLD BULLION
$ 88,000
7. Assay reports state the amount of gold found in samples taken from a given area.↩
8. The assay certificate is very similar to the assay report of April 1979.↩
9. It has been known for many years that the beaches at Cape Yakataga contain small particles of gold which are apparently washed down the Yakataga River from deposits in the interior of Alaska.↩
10. Dister and Hamsley conceded on brief that they are not entitled to the deductions claimed by them for "rent on business property" and "right to mine," respectively. Consequently our inquiry is limited to the deductions claimed for mining expenses.↩
11. Because of this conclusion, we need not address respondent's alternative arguments for disallowing the deductions.↩