James E. SOCHIN,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Dennis S. BROWN,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Nos. 87–7024, 87–7032.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 16, 1987.

Decided March 29, 1988.

Joseph Wetzel, Wetzel & DeFrang, Portland, Or., for petitioners-appellants.

Michael C. Durney, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CHOY, GOODWIN and BEEZER, Circuit Judges.

CHOY, Circuit Judge:

James Sochin and Dennis Brown ("Taxpayers") appeal from the tax court's deficiency determinations. The court disallowed the losses and expenses deducted by Taxpayers with respect to investments in straddle transactions involving forward contracts. The court held that the transactions were "factual shams." *Brown v. Commissioner*, 85 T.C. 968, 998–1000 (1985). On appeal, Taxpayers allege that the tax court: 1) failed to apply the proper legal standard for determining what a sham is; 2) failed to make adequate factual findings as required by 26 U.S.C. § 7459(b); 3) improperly considered evidence of other investors involved in the same investment program; and 4) based its sham determina-

tion on clearly erroneous factual findings. We affirm.

## FACTUAL BACKGROUND

Taxpayers claimed losses from investments in straddles [1] in forward contracts [2] to buy and sell certificates issued by the Government National Mortgage Association ("Ginnie Maes") and the Federal Home Loan Mortgage Corporation ("Freddie Macs"). The investments were part of an investment program promoted by Gregory Government Securities, Inc. ("GGS") and Gregory Investment & Management, Inc. ("GIM"). William Gregory incorporated both organizations in Oregon in 1979. Under the program, GIM served as a financial adviser to prospective investors, while GGS, as a registered broker-dealer, was the requisite seller or buyer in each investor transaction.

A disclosure memorandum provided by GIM to each prospective investor purported to offer an interest rate speculation program. The investor informed GIM of his or her forecast of interest rates; GIM, in turn, would recommend a portfolio of forward contracts for Government securities that it believed would create a profit if the forecast was accurate. The memorandum also stated that the investor could request cancellation of a particular contract before its settlement date, at which point he or she would be credited or charged with any profit or loss, in addition to being charged a fee for the "risk and administrative costs created by the cancellation of the contract." The memorandum indicated the fees to be charged for each transaction. Furthermore, GGS had full authority to determine the contract prices.

The tax court found that the program worked essentially as follows: The investor would make a deposit (of the greater of $10,000 or .125 percent of the face value of the portfolio) and furnish GIM with an interest rate forecast. At this point, each

---

**1.** A straddle is the simultaneous holding of a buy and sell position in similar commodities.

**2.** A forward contract is like a futures contract; i.e. an agreement to buy (long) or sell (short) a specific quantity of a commodity at a specified price on an agreed upon future date (the "settlement" date).

investor executed a customer agreement giving GGS full power to liquidate any open position whenever "necessary for [its] protection," with or without notice to the investor. Each investor also executed a power of attorney authorizing GIM to act for the investor. Based on the interest rate forecast, GIM would prepare a portfolio of forward contracts on Ginnie Maes and Freddie Macs. This original portfolio constituted a straddle, since fifty percent of the contracts were to purchase securities (long positions), and fifty percent were to deliver securities (short positions). Any significant change in the prevailing interest rate would result in a loss in one "leg" of the straddle; that leg would be canceled to create an ordinary loss for the investor in the year of cancellation. The court found that such losses generally approximated ten times the original investment. GGS would then replace the canceled contracts with similar contracts, thus reestablishing the straddle. GGS then entered into new contracts with the investor which offset or opposed the existing contracts to "lock in" the gain from the non-canceled leg of the original straddle. Finally, after the gain was deferred for a sufficient period of time, the contracts were assigned to a third party,[3] which allowed the investor to realize his gain. The amount payable to GGS from the initial cancellation of the loss leg was offset against the receivable due the investor in approximately the same amount as a result of the assignment of the gain leg.

No investor ever purchased or sold Ginnie Maes or Freddie Macs. Instead, all loss positions were canceled and all gain positions were assigned (and reassigned to GGS) before the settlement date. The tax court found that adjustments to the contract price or fees charged generated the minor net profits or net losses reflected in investor accounts.

Brown's experience with the program resulted in the following:[4] after proceeding through the process outlined above, his $10,000 investment generated a $100,160 ordinary loss in 1979, and a $106,382 net long-term capital gain in 1981. The net gain of $6,222 before taxes was reduced to a net overall profit of $122 after the deduction of $6100 in fees. Brown deducted the alleged losses and reported the subsequent gains on his federal income tax returns for 1979 and 1981, respectively. Sochin, who was employed by Harsh Investment Corporation, participated in the program with a group of the corporation's employees. His $2000 portion of the group investment generated a $20,080 ordinary loss in 1979, and a $21,961 net long-term capital gain in 1981. The net gain of $1,881 before taxes was reduced to a net overall profit of $461 after the deduction of $1,420 in fees.[5]

## DISCUSSION

### I. The Proper Legal Standard for the "Sham" Determination

▪ Taxpayers argue that the tax court failed to apply the correct legal standard to determine whether the investments were shams. The tax court's conclusion that the transactions were shams is a finding of fact that is reviewed under the clearly erroneous standard. *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1548 (9th Cir.1987). However, the legal standard applied by the tax court in making the sham determination is reviewed de novo.[6] *Id.*

---

3. GGS assigned the contracts to closely associated third parties. These third parties immediately assigned the contracts back to GGS at the same price. Thus, these groups did not realize any income from the acquisition or disposition of the contracts, but were paid $100 from GGS for each assignment (which was charged to the investors account).

4. Brown and Sochin represent two of four cases chosen as being generally representative of 1400 similar cases pending before the tax court.

5. Sochin also participated in the program in 1980, and 1981. The transactions were similar to his 1979 investment, except that he experienced slight net losses rather than gains each year.

6. In 1984, Congress enacted section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630–31, which governs the allowance of pre-June 24, 1981 straddle loss deductions. Under section 108, a loss resulting from a straddle transaction is deductible if the

## A. The Proper Test

■ We noted in *Bail Bonds* that courts "typically focus" on the related factors of whether the taxpayer has shown 1) a non-tax business purpose (a subjective analysis), and 2) that the transaction had "economic substance" beyond the generation of tax benefits (an objective analysis). 820 F.2d at 1549. However, we did not intend our decision in *Bail Bonds* to outline a rigid two-step analysis. Instead, the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses. *See, e.g., Neely v. United States*, 775 F.2d 1092, 1094 (9th Cir. 1985); *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). Thus, the tax court's failure to specifically delineate a two-prong test and the factual findings that support each prong is not itself fatal.

## B. The Tax Court's Legal Standard

■ The tax court's analysis indicates that it considered the proper factors and applied the correct legal standard to reach its conclusion. After noting that the loss must result from a "bona fide transaction," the court held that Taxpayers "failed to establish that the entire program ... did not exist solely to provide tax benefits for its investors." *Brown*, 85 T.C. at 988. Further, the court likened the transactions to those in *Julien v. Commissioner*, 82 T.C. 492 (1984), in which the disallowance was based on a finding that the transaction served no economic function other than the

generation of tax deductions. 85 T.C. at 999. Finally, in discussing the imposition of damages, the court held that "[Taxpayers] were sufficiently knowledgeable and sophisticated with respect to business and tax matters to have known, and actually did know, ... that the transactions were "too good" to be real and therefore were shams." *Id.* at 1001.

In short, the tax court reviewed the transactions for economic effects other than the creation of income tax losses, and in doing so considered both economic substance and business purpose. The court thus applied the proper legal standard.

## II. *Factual Findings Under 26 U.S.C. § 7459(b)*

Title 26 U.S.C. § 7459(b) (1982) requires the tax court to "report in writing all its findings of fact." Taxpayers allege that the tax court's factual findings failed to account for substantial evidence presented at trial.

■ Findings of fact are sufficient if they provide the appellate court with a clear understanding of the basis of the lower court's decision and the grounds upon which it reached that decision.[7] *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1444 (9th Cir.1985); *Nicholson v. Board of Education Torrance Unified School District*, 682 F.2d 858, 866 (9th Cir.1982). This court will not reverse because of inadequate factual findings "unless a full understanding of the question is not possible without the aid of separate findings." *Vance v. American Hawaii Cruises*, 789 F.2d 790, 792 (9th Cir.1986).

---

investor had a "reasonable expectation of profit." *Wehrly v. United States*, 808 F.2d 1311, 1314 (9th Cir.1986). However, the "reasonable expectation of profit" standard is not applied until the court determines that the transaction is itself bona fide, i.e. that it is not a sham. *See Enrici v. Commissioner*, 813 F.2d 293, 295 n. 1 (9th Cir.1987); *Mahoney v. Commissioner*, 808 F.2d 1219, 1220 (6th Cir.1987). Thus, the tax court in the present case never reached section 108.

**7.** We adopt this proposition from cases decided under Fed.R.Civ.P. 52(a), which states that in

non-jury trials, "the court shall find the facts specially and state separately its conclusions of law...." This court has previously cited Rule 52(a) cases and § 7459(b) cases interchangeably. For example, *Handeland v. Commissioner*, 519 F.2d 327, 329 (9th Cir.1975), a tax case, cited *Rayonier, Inc. v. Polson*, 400 F.2d 909, 923 (9th Cir.1968), a Rule 52(a) case, in its description of the findings "federal courts" must make to support their conclusions. In turn, *McCune v. F. Alioto Fish Co.*, 597 F.2d 1244, 1249 (9th Cir.1979), a Rule 52(a) case, cited *Handeland* for the same purpose.

■ While the tax court did not specifically account for the basis upon which a great deal of testimony was discounted or disregarded, its twenty-eight pages of factual findings clearly outline its conclusions regarding the operation of the investment program. The court's findings are "sufficient to indicate the factual basis for its ultimate conclusions." *Id.* We thus deny Taxpayers request for a remand based on § 7459(b).

### III. *Admission of Evidence of Other Transactions*

Taxpayers argue that the tax court erred in considering evidence of transactions of other investors in concluding that the investments were shams. The court admitted the evidence in order to determine whether the Taxpayers' transactions were bona fide. *See Brown*, 85 T.C. at 972 n. 6.

■ We review the trial court's decision to admit or exclude evidence based on the issue of relevancy for an abuse of discretion. *Lies v. Farrell Lines*, 641 F.2d 765, 773 (9th Cir.1981).

■ Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The tax court admitted evidence of other investor transactions in the GGS program as relevant to the sham determination. As discussed above, at least part of the sham analysis focuses on the "economic substance" of the transaction; i.e. whether it was "likely to produce economic benefits aside from a tax deduction." *Bail Bonds*, 820 F.2d at 1549. A consideration of the entire investment program directly

relates to the analysis of Taxpayers probable economic benefits. It is also directly relevant to the court's assessment of Taxpayers' credibility with respect to their assertions of a non-tax based motive. The tax court acted well within its discretion in considering the evidence.[8]

### IV. *The Tax Court's Findings of Fact*

■ Taxpayers' final argument is that several of the tax court's findings of fact with respect to the sham determination are clearly erroneous. We note at the outset that the tax court's ultimate conclusion that the transactions were shams is itself a finding of fact which will not be reversed unless clearly erroneous.[9] *Bail Bonds*, 820 F.2d at 1548; *Thompson*, 631 F.2d at 646. The clearly erroneous standard is particularly appropriate when, in instances such as this, the sham determination is based in part on the evaluation of conflicting evidence and live testimony. *Enrici*, 813 F.2d at 295. Finally, as we indicated in a previous sham case, "[t]he expertise that the Tax Court brings to bear in its consideration of these complex factual situations provides ... further reason to defer to its conclusion." *Thompson*, 631 F.2d at 646.

■ Application of these principles to the facts of this case clearly supports the tax court's conclusion that the transactions were shams. The entire program existed within a self-contained market operated and controlled by Mr. Gregory and his affiliates. The absolute power that Taxpayers conferred upon GGS to set contract prices and perform any act to alter existing contractual obligations, combined with the fact that no contract was ever enforced, entitled the tax court to infer that the entire program existed solely to provide tax benefits.[10] Even assuming the pricing formula

**8.** As Taxpayers acknowledge, we have previously allowed evidence in tax cases of transactions involving persons not before the court. *See Goldberg v. United States*, 789 F.2d 1341, 1344 (9th Cir.1986); *Karme v. Commissioner*, 673 F.2d 1062, 1064 (9th Cir.1982).

**9.** In addition, the Commissioner's determination that the transaction is a sham is presumptively correct, and Taxpayers have the burden of producing evidence to rebut the deficiency determi-

nation and burden of persuasion to substantiate the deduction. *Goldberg*, 789 F.2d at 1343; *see Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

**10.** Taxpayers contest the tax court's conclusion that price and fee "adjustments" accounted for the slight profits or losses reflected in some of the accounts. Yet, in a number of instances, fees actually charged varied significantly from those indicated in the disclosure memorandum.

utilized was commercially acceptable, the complete authority to "manipulate and dictate the price and timing of the artificial transactions ... allows a taxpayer ... to reap larger and surer tax advantages with much less economic risk than he would have had he entered into real transactions." *Enrici*, 813 F.2d at 296. Indeed, no reasonable investor would surrender total control of his or her ability to profit or lose unless satisfied that the risk of loss had been greatly diminished or eliminated. In short, Taxpayers invested in a program designed to reap the tax benefits of real market investments without bearing the consequent risks.[11]

Taxpayers' other allegations of clearly erroneous factual findings are unpersuasive in light of the economic realities surrounding the GGS-controlled "marketplace."[12] The tax court concluded that "the losses claimed by [Taxpayers] are not allowable because the disputed transactions constituted factual shams which were inspired, designed, and executed by Mr. Gregory and the two corporations controlled by him for the sole purpose of attempting to achieve tax losses for their investors." *Brown*, 85 T.C. at 1000. This conclusion is not clearly erroneous.

## CONCLUSION

Taxpayers have failed to carry the burden of producing evidence to rebut the Commissioner's deficiency determinations and substantiate the deductions. Accordingly, the tax court's decision is AFFIRMED.

BEEZER, Circuit Judge, concurring:

I cannot reconcile *Bail Bonds By Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543 (9th Cir.1987) with our prior precedent. There, we applied the two-prong disjunctive test adopted by the Fourth Circuit in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985). Unlike the genuine recourse indebtedness in *Rice's*, however, the transaction in *Bail Bonds* existed only on paper.

I believe that a transaction which is in substance only "financial gymnastics," purely artificial, or a "paper chase" does not require any inquiry into the profit motive. *Enrici v. Commissioner*, 813 F.2d 293, 295 n. 1 (9th Cir.1987); *Mahoney v. Commissioner*, 808 F.2d 1219, 1220 (6th Cir.1987); *see Goldberg v. United States*, 789 F.2d 1341 (9th Cir.1986) (affirming sham determination focusing entirely on economic substance); *Neely v. United States*, 775 F.2d 1092 (9th Cir.1985) (invalidating putative tax consequences of sham trust on grounds that it had "no economic effect other than to create income tax losses"); *Thompson v. Commissioner*, 631 F.2d 642 (9th Cir.1980) (economic substance); *Karme v. Commissioner*, 673 F.2d 1062 (9th Cir.1982) (economic substance).[1]

---

Thus, the tax court's rejection of Taxpayers testimony that the fees were subsequently "negotiated" is not clearly erroneous.

As to the pricing formula, it is uncontested that the customer agreement gave GGS full power to determine the prices at which the contracts were executed.

11. Further, as we noted in *Enrici*, "the claiming of deductions from artificial straddles that are designed to look similar to marketplace straddles ... has a much greater potential for abuse than deductions from marketplace straddles." 813 F.2d at 296.

12. For example, Taxpayers strongly criticize the tax court's failure to find that the investment contracts were enforceable. However, the client agreement signed by each investor gave GGS the authority to enter into or cancel any contractual obligation with or without notice to the investor. Further, as noted previously, no contract was ever enforced. Thus, the tax court may have concluded that the alleged contractual obligation was illusory. Such a conclusion is not clearly erroneous. *See Bail Bonds*, 820 F.2d at 1550 (absence of arm's length dealing and lack of evidence demonstrating that obligation to repay loans was genuine supports conclusion that alleged legal obligation to repay loans was purely formal; thus, interest on loans not deductible).

1. I agree with the opinions's footnote 6 which states that section 108 of the Deficit Reduction Act of 1984 does not apply to transactions that are not bona fide. For that reason, this court's opinion in *Wehrly v. United States*, 808 F.2d 1311 (9th Cir.1986), and the Tenth Circuit's recent opinion in *Miller v. Commissioner*, 836 F.2d 1274 (10th Cir.1988), are inapposite.

I express no opinion whether the two prong disjunctive test adopted in *Rice's* properly applies to genuine transactions; such is not the case here.

The Tax Court should be affirmed.