David G. COLLINS; Pamela Collins; Bernie Gates; Maureen Gates; Anne Hamsley; and David Dister, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 87–7337, 87–7352.

United States Court of Appeals, Ninth Circuit.

Submitted May 5, 1988 *.

Decided Sept. 30, 1988.

---

* Submitted on briefs and record because appellants' counsel failed to appear at oral argument.

Robert T. Gilleran, Los Angeles, Cal., for petitioners-appellants.

William S. Rose, Jr., Asst. Atty. Gen., Tax Div., Washington, D.C., for respondent-appellee.

Before GOODWIN and HALL, Circuit Judges, and PANNER,** District Judge.

PANNER, Chief District Judge:

Taxpayers David and Pamela Collins, Bernie and Maureen Gates, Anne Hamsley, and David Dister (taxpayers), appeal the Tax Court's disallowance of deductions for mining development expenses and imposition of penalties for negligence.[1] We affirm.

## BACKGROUND

For centuries, rivers have deposited tiny flakes of gold on the sandy beaches of Cape Yakataga, Alaska. Taxpayers claimed mining development expenses for a venture ostensibly intended to extract these flakes of gold from Cape Yakataga. The issue is whether taxpayers sought gold in the sands of Cape Yakataga or in the provisions of the Internal Revenue Code.

Lords Mine Inc. (Lords) and Cape Yakataga, Ltd. (CY), which owned mining claims on Cape Yakataga, joined with Alaska Mining and Processing Co. (AMP), in marketing this mining venture. The venture worked as follows: taxpayers purchased allegedly gold-bearing "mineral aggregate" (beach sand) from claims owned by Lords and CY. At the same time, taxpayers agreed that AMP would develop their sand for production. For AMP's mining development services, taxpayers paid AMP cash and executed "Full Recourse" promissory notes, whose face value was four times the cash payment to AMP. The notes required taxpayers to pay Columbia Financial Corporation (Columbia) 10% simple interest annually, with principal due in ten years.

On their income tax returns, taxpayers deducted their payments to AMP as mining development expenses. *See* I.R.C. § 616(a) (1976) (further citations are to the 1976 United States Code). For example, Dister purchased 4,000 cubic yards of sand from CY for $150 plus 60% of his net profits. He paid AMP $5,000 cash and a $20,000 note. On his income tax return he claimed a $25,000 mining development expense.

Before investing, taxpayers reviewed prospectuses. The prospectuses emphasized the venture's tax benefits and asserted that taxpayers would likely prevail if the Internal Revenue Service attempted to disallow the deductions. The prospectuses contained a tax opinion stating that deductions for mining development expenses would be proper if the sand contained commercially exploitable quantities of gold. The prospectuses estimated that each cubic yard of sand would yield $35 in gold, and included reports supposedly supporting this estimate.

Taxpayers showed more interest in tax benefits than in mining. They knew little

---

** The Honorable Owen M. Panner, Chief United States District Judge, District of Oregon, sitting by designation.

1. The year in issue is 1980 for Collins and 1981 for Dister, Hamsley, and Gates. A negligence penalty was not assessed against Collins.

or nothing about mining. They could not evaluate the reports indicating the sand's gold content, and they did not request independent expert advice. They never visited Cape Yakataga and did not choose the location of their sand. They did not try to determine whether AMP was a reputable mining company or whether AMP's charges for mining were reasonable.

Taxpayers submitted no financial statements or income reports to Columbia, which financed the promissory notes. Taxpayers paid no interest on the "Full Recourse" notes. The Tax Court found no evidence that Columbia arranged financing or even existed.

AMP's mining operation was a fiasco, never progressing beyond aborted equipment tests. AMP recovered an ounce or two of gold before shutting down permanently in late 1983.

The Commissioner of Internal Revenue disallowed taxpayers' mining development deductions and assessed negligence penalties under I.R.C. § 6653 against Dister, Hamsley, and Gates. The Tax Court upheld the disallowances, finding that taxpayers had no profit motive and that their investments lacked economic substance. The court also affirmed the penalties for negligence.

### STANDARD OF REVIEW

We uphold the Tax Court's findings of fact unless clearly erroneous. *Polakof v. Commissioner*, 820 F.2d 321, 323 (9th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). We review the Tax Court's conclusions of law de novo. *Sochin v. Commissioner*, 843 F.2d 351, 353 (9th Cir.1988), *petition for cert. filed*, 56 U.S.L.W. 3881 (U.S. May 19, 1988) (No. 87–2026).

### DISCUSSION

I. *The Legal Standard*

Taxpayers contend that the Tax Court applied an incorrect legal standard. The court applied the "generic tax shelter" test, which it first formulated in *Rose v. Commissioner*, 88 T.C. 386 (1987), *appeal filed*, No. 88–1012 (6th Cir.).

### A. The Correct Standard

 Section 616(a) allows taxpayers to deduct "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit ... if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." A taxpayer may deduct development costs only if the primary objective of the mining venture was to make a profit. *Thomas v. Commissioner*, 792 F.2d 1256, 1259 (4th Cir.1986). However, the court does not inquire into a transaction's primary objective until it determines that the transaction is bona fide, that is, not a sham. *Sochin*, 843 F.2d at 353–54 n. 6. In determining the existence of a sham, we apply the *Sochin* court's analysis: the court should determine whether the transaction "had any practical economic effects other than the creation of income tax losses." 843 F.2d at 354. Both the taxpayer's subjective business purpose and the venture's economic substance may be relevant to this inquiry. *Id.*

### B. The Tax Court's Standard

██ The Tax Court here applied its new generic tax shelter test. Under that test, the court determines whether the disputed scheme is a generic tax shelter and then determines whether the transaction has economic substance. *Rose*, 88 T.C. at 410–12.

After finding that the mining venture was a generic tax shelter, the court analyzed "whether the dealings between the parties to the transaction tend to show a profit objective on the part of [taxpayers], the relationship between the amounts paid by [taxpayers] to the fair market value of their investments, and the structure of the financing used in the transactions." *Dister v. Commissioner*, 53 T.C.M. (CCH) 694, 698 (1987). Because the court examined taxpayers' profit motive and the venture's economic substance, its analysis is consistent with *Sochin*. The label it attaches to

its analysis is irrelevant. In *Sochin*, this court stated:

> [W]e did not intend our decision in [*Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987)] to outline a rigid two-step analysis. Instead, the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's sham analysis; that is, whether the transaction had any practical economic effect other than the creation of income tax losses. Thus, the tax court's failure to specifically delineate a two-prong test and the factual findings that support each prong is not itself fatal.

843 F.2d at 354 (citations omitted). *See also Zmuda v. Commissioner*, 731 F.2d 1417, 1420 (9th Cir.1984) (no real difference between the business purpose and the economic substance tests; both allow the Commissioner to look past a transaction's form to its substance).

Because our analysis in *Sochin* applies here, we need not adopt the generic tax shelter test. The casebooks are already glutted with tests. Many such tests proliferate because they give the comforting illusion of consistency and precision. They often obscure rather than clarify. *Cf.* Nagel, *The Formulaic Constitution*, 84 Mich. L.Rev. 165 (1985) (constitutional opinions now emphasize elaborate tests at the expense of clarity and persuasiveness). Here, the court must look past the mining venture's form and uncover its substance. *See Zmuda*, 731 F.2d at 1421–22. Although the generic tax shelter test is not incorrect, it does not aid courts in that basic inquiry.

## II. Negligence Penalties

■ Taxpayers contend the Tax Court erred in upholding the negligence penalties. Section 6653(a)(1) imposes an "addition to tax," or penalty, for underpayments caused by "negligence or intentional disregard of rules or regulations (but without intent to defraud)." The Commissioner's decision to impose negligence penalties is presumptively correct. *Hansen v. Commissioner*, 820 F.2d 1464, 1469 (9th Cir.1987). This court will uphold the Tax Court's affirmance of a penalty unless clearly erroneous. *Id.*

■ The court determines whether a taxpayer is negligent under the reasonable, prudent person standard. *Id.* If the taxpayer is misguided, unsophisticated in tax law, and acts in good faith, a penalty is not warranted. *Haman v. Commissioner*, 500 F.2d 401, 403 (9th Cir.1974). Hiring an attorney or an accountant will not protect the taxpayer from a negligence penalty, but good faith reliance on professional advice is a defense. *Betson v. Commissioner*, 802 F.2d 365, 372 (9th Cir.1986).

■ Here, taxpayers argue that they properly relied on the tax letter in the prospectus and on their accountants. Their reliance was not justified. The tax letter warned prospective investors that it was written for AMP's president only and that others should seek independent legal advice. The accountants' advice cannot shield taxpayers from liability because the accountants knew nothing firsthand about the mining venture. *See Leonhart v. Commissioner*, 414 F.2d 749, 750 (4th Cir.1969) (taxpayers cannot rely on accountant's advice when that advice was not based on knowledge of all the facts).

The discussions in the prospectus of high write-offs and the risk of audits should have alerted taxpayers that their deductions were questionable at best. Despite these warning signals, taxpayers did not reasonably investigate the venture before investing. *See Zmuda*, 731 F.2d at 1422 (individual investor has duty to make reasonable inquiry before acting). The Tax Court's conclusion that taxpayers were negligent is not clearly erroneous.

## III. Other Issues

■ Taxpayers argue that the Tax Court's findings of fact "make absolutely no sense and are completely unsupported by the record below." Taxpayers are contending either that the court's findings are clearly erroneous or are insufficient. Neither contention has any merit.

The Tax Court's findings that taxpayers lacked a profit motive and that the venture was a sham are not clearly erroneous. The record amply supports these findings.

Under I.R.C. § 7459(b), which requires the Tax Court to report its findings of fact in writing, the Tax Court must "provide the appellate court with a clear understanding of the basis of the [its] decision and the grounds upon which it reached that decision." *Sochin*, 843 F.2d at 354 (footnote omitted). Here, the court's nine pages of factual findings are more than adequate.

Taxpayers also argue that their deductions are justified under the accrual method of accounting. Because these transactions had no economic substance, taxpayers' bookkeeping methods are irrelevant. Taxpayers also contend that the Tax Court's application of the generic tax shelter test violates their rights to due process and equal protection. This contention is without merit.

## CONCLUSION

The judgment of the Tax Court is AFFIRMED.