T.C. Memo. 1999-98


UNITED STATES TAX COURT


TOM I. LINCIR AND DIANE C. LINCIR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22934-89.                    Filed March 29, 1999.


<u>Michael D. Savage</u> and <u>Louis Samuel</u>, for petitioners.

<u>Wilton A. Baker</u> and <u>Kim A. Palmerino</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, <u>Judge</u>:  This case was assigned to Chief Special
Trial Judge Peter J. Panuthos pursuant to the provisions of
section 7443A(b)(4) and Rules 180, 181, and 183.[1]  The Court
agrees with and adopts the opinion of the Special Trial Judge,
which is set forth below.

---

[1]    All section references are to the Internal Revenue Code of
1954, as amended and in effect for the years in issue, unless
otherwise indicated.  All Rule references are to the Tax Court
Rules of Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, <u>Chief Special Trial Judge</u>:  Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows:

| | | Additions to Tax | |
|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)[1] | Sec. 6661 |
| 1978 | $115,780 | $5,789.00 | -- |
| 1979 | 143,636 | 7,181.80 | -- |
| 1980 | 115,213 | 5,760.65 | -- |
| 1981 | 51,489 | 2,574.45 | -- |
| 1982 | 149,866 | 7,493.30 | $37,466.50 |

[1]  For returns required to be filed after Dec. 31, 1981, if the addition to tax under sec. 6653(a)(1) applies, the addition to tax under sec. 6653(a)(2) will also apply in an amount to be determined.

Respondent also determined that, once the deficiencies are determined, petitioners are liable for increased interest on underpayments attributable to a tax-motivated transaction as defined in section 6621(c).

The deficiencies in this case result from respondent's disallowance of certain losses.  The losses include those attributable to petitioners' participation in the "Arbitrage and Carry" gold trading promoted by Futures Trading, Inc. (FTI).  The losses also include those attributable to petitioners' participation in the Treasury bill (T-bill) option and stock forward transactions promoted by Merit Securities, Inc. (Merit), a company that is related to FTI.

The parties have stipulated that--

All adjustments * * * relating to the T-Bill Options
and the Stock Forward Contracts programs promoted by
Merit shall be redetermined in the same manner as

comparable adjustments in <u>Rivera v. Commissioner</u>, Tax Court Docket Nos. 41343-85 and 22921-86 ("CONTROLLING CASES").

The above-mentioned "controlling cases" are two of seven consolidated cases reported as <u>Leema Enterprises, Inc. v. Commissioner</u>, T.C. Memo. 1999-18.  Therein we addressed issues concerning the Merit T-bill and stock forward trades and held that--

> the Merit markets lacked economic substance.  Although the form appeared as markets for particular financial instruments, the substance was the creation of straddles to generate loss deductions without corresponding economic losses. * * * In short, the Merit trades * * * cannot support the losses claimed.

We alternatively held that, even if the transactions had substance, the individual Merit investors' "primary objective was obtaining tax benefits", and thus they "failed to meet the statutory requirements for deducting the losses at issue".

Our holding in <u>Leema Enterprises, Inc.,</u> accordingly disposes of the Merit T-bill and stock forward losses at issue here.  For the reasons stated therein, those losses are not allowed in this case.

The parties have also entered into a "Second Stipulation of Facts" wherein they agreed "that all transactions involving the Arbitrage and Carry ('A/C') program promoted by Futures Trading, Inc. ('FTI') will be ignored for Federal income tax purposes".[2]

---

[2]     In four consolidated cases, <u>Seykota v. Commissioner</u>, T.C. Memo. 1991-234, supplemented by T.C. Memo. 1991-541, we addressed issues concerning the FTI A/C transactions.  Therein we held that the FTI A/C program was an economic sham and disallowed

(continued...)

This second stipulation resolved other issues concerning the deficiencies at issue.

After additional concessions,[3] the issues remaining for decision are: (1) Whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a) (or pursuant to section 6653(a)(1) and (2) for the years 1981 and 1982); (2) whether petitioners are liable for increased interest on underpayments attributable to a tax-motivated transaction pursuant to section 6621(c); and (3) whether petitioners are liable for the addition to tax imposed under section 6661 for making a substantial understatement for the year 1982.

### FINDINGS OF FACT

The parties filed two stipulations of settlement of tax shelter adjustments, a first stipulation of facts with attached exhibits, a second stipulation of facts, and a third stipulation of facts, with more attached exhibits. The facts reflected are

---

[2](...continued)
deductions claimed by the taxpayers for losses incurred in connection with that program.

[3] In 1992, the parties filed a Stipulation of Settlement of Tax Shelter Adjustment that resolved issues relating to the Dorchester litigation project. The parties have also stipulated that petitioner Diane C. Lincir is not entitled to "innocent spouse" relief pursuant to sec. 6013(e) for the years at issue. We also note that the parties' First Stipulation of Facts indicates that the deficiencies for the years involved might be affected by questions of net operating loss and investment tax credit carrybacks from years not before the Court. We accept the parties' representations that these carryback issues have been resolved by their other agreements.

so found, and, by this reference, are incorporated herein. Additionally, the "controlling cases", reported as <u>Leema Enterprises, Inc. v. Commissioner</u>, <u>supra</u>, are incorporated by this reference.

Petitioners Tom I. Lincir and Diane C. Lincir were married and resided in San Pedro, California, when their petition was filed. They were divorced in 1993. Petitioners are high school graduates. Mr. Lincir has taken some junior college classes and is trained as a metalworker. After graduating from high school, Mrs. Lincir took some junior college courses in bookkeeping.

Between 1975 and 1982, petitioners operated two successful physical-fitness businesses. One, Sta-Slim Products, engaged in manufacturing light exercise items, and the other, Ivanko Barbell Co., engaged in the importation and sale of weightlifting equipment. Mr. Lincir was involved in every aspect of the businesses, while Mrs. Lincir handled the accounts payable and ran the office side of the businesses. By 1982, sales of the two companies totaled more than $4 million annually.

Between 1976 and 1980, Mr. Lincir was also involved in dealing in coins and precious metals. He attended weekly seminars that had been formed to discuss investing in precious metals.

Mr. Lincir additionally invested in real estate. One of his associates in an apartment house venture introduced Mr. Lincir to an accountant named Robert Schenkman, a specialist in real estate. Mr. Schenkman became petitioners' accountant. He

assisted Mr. Lincir with incorporating petitioners' businesses, establishing a system for payroll taxes, and preparing petitioners' Federal income tax returns.  Mr. Schenkman helped petitioners to establish a retirement program, which invested its assets in gold.

Mr. Schenkman also provided Mr. Lincir with information about the FTI/Merit promotions.  Mr. Schenkman worked with a representative of FTI, Rusty London, "more or less * * * as a team" concerning FTI/Merit and its clients.  Mr. Schenkman billed Mr. London for the time Mr. Schenkman expended in lining up clients for FTI/Merit.  Mr. Schenkman routinely disclosed to his clients this financial arrangement with Mr. London.

Mr. Schenkman explained to Mr. Lincir that, for tax purposes, the FTI/Merit program would generate gains in the form of long-term capital gains, and losses as ordinary losses.  Mr. Lincir shared this knowledge with Mrs. Lincir.  Mr. Schenkman also provided Mr. Lincir with a private placement memorandum about the FTI/Merit program.  Mr. Lincir tried to read this document but did not understand it.[4]

Mr. Lincir assumed that Mr. Schenkman profited in some way from the business generated by referring clients to FTI/Merit.

---

[4]  The stipulations in this case reflect that the FTI/Merit programs in which petitioners participated took three forms--a gold cash-and-carry program, the trading of options in T-bill futures contracts, and the trading of stock forward contracts. Mr. Lincir apparently considered the changes in form of the FTI/Merit promotion to be a continuation of the same program; as he understood it, "the Tax Code had been changed or something and you can't use gold anymore."

Mr. Lincir did not know the particulars of such arrangements, however, and he had no knowledge of whether FTI/Merit compensated Mr. Schenkman directly.

In 1978, Mr. Lincir invested approximately $225,000 in the FTI/Merit programs. FTI/Merit provided information concerning the tax ramifications of Mr. Lincir's investments directly to Mr. Schenkman; that information was not provided to Mr. Lincir first. Mr. Schenkman told petitioners that the deductions generated by the FTI/Merit program were in accordance with the tax laws.

The following table is derived from petitioners' Federal income tax returns for the years at issue. The table compares petitioners' salary income from their businesses with their "supplemental" losses from FTI/Merit reported on their Schedules 4797, Supplemental Schedule of Gains and Losses:

| Year | Salary Income | FTI/Merit Losses |
|------|---------------|------------------|
| 1978 | $278,600 | ($248,013) |
| 1979 | 278,170 | (342,638) |
| 1980 | 230,000 | (430,840) |
| 1981 | 248,000 | (143,469) |
| 1982 | 302,000 | (257,290) |

The large losses did not concern Mr. Lincir; he had "total confidence" in Mr. Schenkman and felt that bigger gains would come later, because that was the way the program was described.

Mr. Schenkman proposed other investment opportunities to petitioners, but they did not accept any such investment recommendations.

OPINION

1.  <u>Additions to Tax Under Sections 6653(a) and 6653(a)(1) and (2)</u>

Section 6653(a) (and, beginning with taxable year 1981, section 6653(a)(1)) provides for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations.  Section 6653(a)(2) (beginning with the tax year 1981) provides for an addition to tax equal to 50 percent of the interest payable on the deficiency with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations.

Negligence under sections 6653(a) and 6653(a)(1) and (2) is the lack of due care or the failure to act as a reasonable person would act under the same circumstances where there is a legal duty to act.  See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).  Petitioners bear the burden of proving that no part of the underpayments for the years at issue is due to negligence or intentional disregard of rules and regulations.  See Rule 142(a); <u>Bixby v. Commissioner</u>, 58 T.C. 757 (1972).

In this case, the high writeoffs generated by the FTI/Merit programs were reflected as consistent annual losses of hundreds of thousands of dollars.  The losses approached, and often exceeded, petitioners' income from their two businesses.  Write-offs of this magnitude should have alerted petitioners that their deductions were, at best, questionable.  See <u>Collins v.</u>

Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217. In such cases, taxpayers have a duty to show that they made reasonable inquiry into the validity of the investment plans that generated such deductions. See <u>Zmuda v. Commissioner</u>, 731 F.2d 1417, 1422, 1423 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners have not made such a showing. Their reliance upon the advice of Mr. Schenkman did not constitute a "reasonable inquiry". An accountant's advice cannot shield taxpayers from liability for the negligence penalties when the accountant lacks knowledge of pertinent facts relating to the venture as to which the taxpayers are seeking advice. See <u>Collins v. Commissioner</u>, <u>supra</u>. Petitioners have not demonstrated that Mr. Schenkman possessed sufficient expertise to advise them about the gold trading or financial instruments involved in the FTI/Merit programs. To the contrary, Mr. Schenkman has conceded that he was not a specialist in gold trading or financial instruments. He has stated that he merely "tried to lay out what the tax consequences would be based on the information given to me by the promoter". Mr. Lincir had substantial exposure to the practices of precious metal trading. He knew, or should have known, of Mr. Schenkman's relative lack of experience.

Moreover, it was not reasonable for petitioners to base substantial tax losses solely upon the advice of a tax adviser who has an economic interest in promoting the investment. Investors instead have a duty to consult with competent advisers

who are independent of the program, or they must otherwise examine the validity of the program.  See <u>Marine v. Commissioner</u>, 92 T.C. 958, 993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991).  Mr. Schenkman was not independent of the FTI/Merit programs.  He instead stood to profit from the business generated by getting his clients into the FTI/Merit programs, and he routinely advised his clients of that fact.  Mr. Lincir concededly knew that, in some fashion, Mr. Schenkman would earn additional income by getting his clients into the program.

We do not accept the notion that petitioners are naive and trusting individuals who were led astray by bad tax advice. Petitioners have developed and maintained two successful businesses.  These businesses have generated millions of dollars in sales and annual incomes for petitioners in the hundreds of thousands of dollars.  Moreover, in addition to being a successful businessman, Mr. Lincir participated in precious metal trading and real estate ventures.  We conclude that petitioners possessed enough experience and knowledge of business to have known that they should have evaluated the substantial tax deductions at issue more carefully.

On the record before us, petitioners have failed to show that we should reject respondent's determined additions to tax for negligence.

## 2.  <u>Section 6621(c) Additional Interest</u>

Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a substantial

underpayment (i.e., one that exceeds $1,000) in any taxable year in which the understatement is "attributable to 1 or more tax motivated transactions".  Petitioners bear the burden of proof as to this issue.  See Rule 142(a); Boyd v. Commissioner, 101 T.C. 365, 373 (1993).

In Seykota v. Commissioner, T.C. Memo. 1991-234, supplemented by T.C. Memo. 1991-541, we found that the FTI/Merit transactions were tax-motivated transactions within the meaning of section 6621(c).  We again made the same finding with respect to the Merit T-bill and stock forward trades in Leema Enterprises, Inc. v. Commissioner, T.C. Memo. 1999-18. Petitioners have presented no evidence to show that these findings should not apply to them.  Accordingly, the additional interest imposed by section 6621(c) is applicable to petitioners.[5]

3.  Substantial Understatement of Tax Under Section 6661

Respondent has determined additions to tax under section 6661 for 1982.  For returns due after December 31, 1982 (but before January 1, 1990), section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement.  An understatement

---

[5]     The First Stipulation of Facts recites that some of the deficiencies at issue related to the Dorchester project, as opposed to the FTI/Merit programs.  In a stipulation filed July 1, 1992, however, the parties agreed that petitioners were entitled to only 25 percent of the claimed deductions relating to the Dorchester project and, further, that any underpayments attributable to Dorchester transactions were attributable to "tax-motivated transactions" within the scope of sec. 6621(c).

is "substantial" when the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000. The understatement is reduced to the extent that the taxpayer (1) has adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item. See sec. 6661; sec. 1.6661-6(a), Income Tax Regs. Petitioners again bear the burden of showing that they are not subject to the addition to tax determined by respondent. See Rule 142(a); Cochrane v. Commissioner, 107 T.C. 18, 29 (1996).

Petitioners presented no evidence to show that respondent erroneously determined the addition to tax under section 6661. Accordingly, we hold that petitioners are liable for the addition to tax under section 6661. Their concessions with respect to the deficiencies at issue show that their understatement for 1982 exceeds the greater of $5,000 or 10 percent of the tax required to be shown on their return for 1982. Respondent determined that all of petitioners' 1982 underpayment is attributable to that substantial understatement. Because petitioners have not disputed this determination, we so hold.

In view of the foregoing,

Decision will be entered

under Rule 155.