PAUL S. MOSESIAN AND DIANE M. MOSESIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mosesian v. Commissioner
Docket No. 30023-87
United States Tax Court
T.C. Memo 1990-415; 1990 Tax Ct. Memo LEXIS 432; 60 T.C.M. (CCH) 419; T.C.M. (RIA) 90415; August 6, 1990, Filed Decision will be entered for the respondent. Paul S. Mosesian and Diane M. Mosesian, pro se. Steven R. Guest and Edward G. Langer, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A of the Code. [1] The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income tax, additions to tax, and additional interest as follows: Additions to Tax and Interest
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
6621
1978
$ 18,788.00
$ 939
--
--
$    805
** *433 1979
13,300.00
665
--
--
3,990
**
1980
10,060.00
503
--
--
3,018
**
1981
26,283.00
--
$ 1,314
*
7,884
**
1982
42,164.07
--
2,108
*
12,649
**
1983
56,980.84
--
2,849
*
17,094
**
The issues for decision are: (1) whether petitioners are entitled to investment credits and deductions for depreciation arising out of petitioner Paul S. Mosesian's investment in two wind turbines, or, in the alternative, whether the amounts claimed are subject to recapture; (2) whether petitioners are entitled to a theft loss as a result of petitioner Paul S. Mosesian's investment in the wind turbines; (3) whether respondent properly disallowed $ 16,472 of charitable contributions claimed on petitioners' 1983 Federal income tax return; (4) whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules or regulations; (5) whether petitioners are subject to the 30-percent addition to tax under section 6659, or, in the alternative, to the addition to tax under section 6661; and (6) whether petitioners are liable for additional interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners were residents of Fresno, California, at the time of filing of their petition. Petitioners were married in July 1982. References to petitioner *434 in the singular are to Paul S. Mosesian. Petitioner is a lawyer who has practiced in the Fresno, California, area since 1964. He has been involved in many different businesses, including farming and agriculture, real estate, land development, real estate appraisal, horse racing, raisin salvaging, and rental of real estate. Free-Wing Turbine Corporation (FWTC) was incorporated in Utah in 1980 for the purpose of developing and promoting wind-driven turbines to generate electrical power. Laird B. Gogins (Gogins), the president of FWTC, designed a so-called "free-wing" wind turbine. Trans Power Manufacturing, Inc. (Trans Power), was incorporated in Utah in 1981. The stated purpose of the corporation was to build, operate, and sell wind machines that would produce electricity for sale to California public utilities. Trans Power was formed by Ben Helsten (Helsten) who, prior to becoming involved in the wind energy business, sold insurance. Trans Power acquired from Gogins the right to build and develop the free-wing wind turbine invented by him. During the summer of 1981, Trans Power began construction of a wind turbine based on the design of Gogins in Corona, California. The Corona *435 wind turbine took approximately 6 months to construct, but it was never connected to a power grid. The wind turbines eventually produced, promoted, and sold by Trans Power were Trans Power's modification of Gogins's design, which was a new concept in wind turbines. The Trans Power wind turbine consists of two towers about 200 feet apart. Each tower has a large pulley wheel near the top of the tower and another wheel at the bottom of the tower. Cables are stretched from one wheel on a tower to a corresponding wheel on the other tower, and fabric sails are stretched from the top cable to the bottom cable. When the wind blows, the sails move the cables. The moving cables turn the wheels on the tower and power a generator, which produces electricity. The major components of the wind turbine include two concrete foundations, two towers, four wheels, six gin poles, two cables, sails, a generator, and metering equipment. FWTC began offering the wind turbines for sale in 1981, with Helsten as the company's selling agent. Helsten, who received commissions from the sale of the wind turbines, sold three or four wind turbines for FWTC. Helsten subsequently acquired from FWTC the rights to *436 sell the wind turbines, which he sold through his corporation, Trans Power. The 1981 investment prospectus prepared for potential purchasers of the wind turbines stated that the machines were new and commercially untested and had never been operated. The 1981 prospectus included a sample purchase agreement and a summary of the sales transaction. The prospectus stated that the seller anticipated that a wind turbine would be operational on site approximately 60 to 90 days after execution of a purchase agreement. According to the prospectus, the purchase price of a wind turbine was to be paid 25 percent in cash, with the remainder to be paid by a nonrecourse promissory note. The prospectus stated that wind turbines would be sold only to those individuals with a net worth in excess of $ 100,000 and who expected that some portion of their income would be subject to tax in the 50 percent or higher tax bracket during the year of purchase. The "Projections" section of the 1981 prospectus contained cash flow projections based on a purchase price of $ 200,000 for a wind turbine. First-year income from a wind turbine was projected to be $ 61,000 and total depreciation was projected to be $ *437 224,611. The 1981 prospectus stated that the projections should be treated as speculation and that they should not be relied on by prospective purchasers of wind turbines. The projections were prepared by Gogins and his engineering group and were based on his original design, not the modified design of Trans Power on which the wind turbines were actually based. The 1981 prospectus contained a discussion of the tax consequences of purchasing a wind turbine and, as an appendix, a tax opinion prepared by attorney Harry Winderman. The opinion discussed basis, investment credit, and limitations on deductions, including section 465 and section 183. The prospectus stated that neither the seller nor seller's agent assumed any responsibility for the tax consequences of purchasing a wind turbine and urged the purchaser to consult a tax advisor with respect to the tax implications of the purchase of a wind turbine. Furthermore, the prospectus stated that the tax benefits of a wind turbine investment were "not free from doubt," and that the benefits might be "reduced or entirely eliminated" if the Internal Revenue Service prevailed on a position contradictory to those outlined in the opinion *438 supplied by tax counsel. The 1982 prospectus was similar in content to the 1981 prospectus. The 1982 prospectus stated, as did the 1981 prospectus, that the wind turbine had never been operational. During 1981, Trans Power and Helsten sold more than 20 wind turbines to be erected at Oak Creek Wind Park in Tehachapi, California. In 1982, Trans Power and Helsten sold more than 20 wind turbines to be located at Cabezon Wind Park in Palm Springs, California. Trans Power and Helsten sold approximately 10 wind turbines in 1983 to be erected in the future at Cabezon Wind Park. In November 1981, Trans Power entered into a ground lease agreement with Oak Creek Energy Systems, Inc. (Oak Creek), for the lease of land at Tehachapi, California, on which wind turbines would be operated. On December 29, 1981, Trans Power was granted a building permit to construct ten wind turbines at Tehachapi. The permit allowed construction of the machines for data collection and testing purposes only. As of December 31, 1981, only one turbine had been erected at Tehachapi, and this was a test machine. As of late October 1982, only a single wind turbine was completely erected at Tehachapi, and it was not operational *439 at that time. During the years 1981 through 1983, Trans Power was paid a total of $ 200 by Oak Creek for power generated by Trans Power turbines located at Tehachapi. Only three wind turbines were ever connected to a power grid, however, and nothing in the record indicates that Oak Creek had an agreement with any utility to sell energy produced by Trans Power or FWTC wind turbines. Aztec Energy Corporation (Aztec) was formed by Robert Paul (Paul) in 1982. The stated purpose of Aztec was to locate sites for, to acquire permits for, and to construct, wind energy farms. Aztec was not in the business of selling wind turbines. In the fall of 1982, Paul met with Helsten, and the two agreed that Paul would try to find sites upon which to erect Trans Power's wind turbines. In December 1982, Aztec acquired property in Cabazon and commenced development of a wind park site on that property. Aztec's offices were approximately 12 miles from the site, which Paul visited almost daily. Paul was employed by Helsten from late December 1982 through March or April 1983 to supervise the construction of Trans Power's wind turbines at Cabazon. Trans Power began construction of its wind turbines at the *440 Cabazon site during the second week of December 1982. As of December 31, 1982, no wind turbine was fully erected and capable of producing electricity at the Cabazon site. Ultimately, only two wind turbines were completely erected at the Cabazon site. On December 27, 1982, Aztec entered into a wind park power purchase and sales agreement with Southern California Edison Company (SCE). The agreement permitted Aztec to sell to SCE power generated at the wind park at Cabazon. SCE constructed a substation at the Cabazon site in the summer or fall of 1983. No Trans Power wind turbine at Cabazon was ever connected to a power grid operated by SCE or any other utility, and Aztec never received any payments from SCE for electricity produced by any Trans Power wind turbine located at the Cabazon site. In March 1983, Trans Power ceased its construction of wind turbines at Cabazon, and Aztec discontinued operation of the wind park in November 1984. Several fundamental problems were inherent in the design of the wind turbines. First, the "wings" or "blades" of the turbine were not capable of moving the cables at sufficient speed to generate the power claimed in the prospectus. Second, the machines *441 were too low to the ground (40-foot height). Wind shear near the ground would prevent them from operating at sufficient speed. Most importantly, the wind turbines could not operate continuously in the absence of a full-time attendant, which made them impossible to operate profitably. Finally, the performance of the wind turbines was greatly exaggerated in the prospectus; they were simply incapable of generating enough power to make them economical. The Trans Power wind turbines at Tehachapi and Cabazon were unreliable and incapable of operating for more than a day or two at a time without breaking down. The wind turbines never operated on a sustained basis or generated more than an insignificant amount of electricity. No more than three of the wind turbines were ever connected to a power grid to enable electricity generated by them to be sold to a utility. The fair market value of a wind turbine was no more than its salvage value of $ 3,000. Petitioner received a copy of the Trans Power 1981 prospectus from Helsten in October 1981. Also in October 1981, petitioner met John Shelburne (Shelburne), who participated in the sales on behalf of Trans Power. Shelburne provided petitioner *442 with additional written material touting the tax benefits of a wind turbine purchase. The materials stated that a tax write-off of better than five-to-one would be possible for 1981, and a write-off of better than four-to-one was possible for 1982. Petitioner had never invested in wind energy equipment prior to his involvement with Trans Power, and he did not obtain an independent appraisal or evaluation of Trans Power's equipment prior to investing. Petitioner executed an agreement dated December 15, 1981, for the purchase of a wind turbine from Trans Power to be erected at Tehachapi (the Tehachapi wind turbine). The total purchase price of the wind turbine was $ 208,000, in addition to which petitioner was obligated to pay a $ 5,000 management fee and a $ 2,000 land lease payment. The purchase price was to be paid as follows: $ 48,000 in cash upon execution of the purchase agreement; a recourse note in the amount of $ 4,000; and the balance in the form of a nonrecourse promissory note. Petitioner executed a nonnegotiable, nonrecourse promissory note dated December 15, 1981, payable to Trans Power in the amount of $ 150,000, to be paid in 15 annual payments of principal and interest. *443 The note bore an interest rate of 12 percent annually and was secured only by petitioner's interest in the Tehachapi wind turbine. Petitioner's total payments on this note did not exceed $ 800. Also in December 1981, petitioner executed a recourse promissory note payable to Trans Power in the amount of $ 4,000 to be paid in 15 annual installments of principal and interest at 12 percent. On December 29, 1981, petitioner wrote a check payable to Trans Power in the amount of $ 48,000. The check bears the notation "Down Payment Wind Electric System Includes $ 2,600.00 of sales tax." Petitioner wrote two other checks dated December 29, 1981, one in the amount of $ 5,000 bearing the notation "Management fee" and the other in the amount of $ 2,000 bearing the notation "Lease payment." Nothing in the record explains the discrepancy between the contract price and the total amount of the notes and checks from petitioner to Trans Power. Petitioner received a letter from Shelburne on December 24, 1981, which stated in part: As we discussed over the telephone, if you decide you want a machine, we want you to know your machine would be started this year but would not actually be completed until *444 the middle of January. We would be able to have a Capacity Rent Check which would indicate 1981 income for your machine. If you would care to pursue a purchase on this basis, we would be very happy to cooperate with you to the fullest extent. In mid-February 1982, petitioner received a check dated February 10, 1982, in the amount of $ 240 designated as a capacity payment for the period ended December 31, 1981, with respect to the Tehachapi wind turbine. Petitioner reported the $ 240 as income on his 1981 Federal income tax return. Petitioner executed an agreement dated December 2, 1982, for the purchase of a wind turbine to be erected at Cabazon (the Cabazon wind turbine). The purchase agreement had not been executed, however, as of December 13, 1982. The purchase price of the Cabazon wind turbine was $ 208,000 and was to be paid as follows: $ 53,000 in cash upon execution of the purchase agreement, with the balance to be paid by a nonrecourse promissory note. In December 1982, petitioner executed a nonrecourse promissory note payable to Trans Power in the amount of $ 155,000, to be paid in 15 equal annual installments with interest at the rate of 9 percent. The note was secured *445 only by petitioner's interest in the Cabazon wind turbine. No payments were ever made by petitioner on the promissory note. On petitioner's 1981, 1982, and 1983 Federal income tax returns, he claimed net losses with respect to the Tehachapi wind turbine of $ 33,710, $ 46,540, and $ 44,730, respectively. He also claimed an investment credit with respect to the Tehachapi machine on his 1981 return, only a portion ($ 11,481) of which he was able to use, and a business energy credit, none of which he was able to use. The unused credits were carried back to petitioner's taxable years 1978, 1979, and 1980, for which years petitioner received refunds of Federal income tax paid in the amounts of $ 18,788, $ 13,300, and $ 10,060, respectively, for a total of $ 42,148. Thus, within months of his cash outlay in December 1981, petitioner had recouped the amount actually paid by him with respect to the Tehachapi wind turbine. On his 1982 and 1983 Federal income tax returns, petitioner claimed net losses with respect to the Cabazon wind turbine of $ 36,200 and $ 45,760, respectively. On his 1982 Federal income tax return, petitioner claimed an investment credit and a business energy investment *446 credit based on his investment in the Cabazon machine. Petitioner used all of the investment credit in 1982, which reduced his Federal income tax liability from $ 30,118 to $ 0. Petitioner's Federal income tax liability for 1983 was reduced by $ 15,082 due to carryover of unused 1982 investment credit and business energy investment credit attributable to the Cabazon wind turbine. OPINION The first issue for decision is whether petitioner properly claimed loss deductions and investment credits with respect to his investment in the Tehachapi and Cabazon wind turbines for the taxable years 1981 and 1982. Petitioner bears the burden of proving his entitlement to the claimed deductions and credits. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Economic Substance
In numerous cases, this Court has held that transactions entered into by taxpayers that lacked economic substance are to be disregarded for tax purposes. See, e.g., Rybak v. Commissioner, 91 T.C. 524 (1988); Cherin v. Commissioner, 89 T.C. 986 (1987); and Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). The mere fact that a transaction generates tax benefits for its investors does not necessarily *447 mean that the transaction lacks economic substance. Frank Lyon Co. v. United States, 435 U.S. 561, 581 (1978).If a transaction is entered into solely for tax benefits and without any other purpose, however, the form of the transaction will be disregarded and the tax benefits denied. Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). Respondent's primary argument in this case is that the transaction involving the wind turbines lacked economic substance. A transaction has economic substance if it offers a reasonable opportunity for economic profit. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983).The economic substance test is an objective test. On the facts of this case, we hold that respondent properly disallowed the claimed deductions and credits because petitioner's investment in the two wind turbines lacked economic substance. We find that the investment was without economic substance, for tax purposes, because petitioner was motivated by no purpose other than obtaining tax benefits, and no reasonable possibility of making a profit existed. Rice's Toyota World, Inc. v. Commissioner, supra at 91. At trial, *448 petitioner presented no expert testimony on the issue of the fair market value of a wind turbine. Helsten testified that a wind turbine cost in excess of $ 100,000 to construct. Dr. Robert E. Wilson, a professor of engineering and the author of numerous articles on the engineering aspects of wind turbines, testified on behalf of respondent. We found Dr. Wilson to be a credible, highly qualified witness. Although agreeing that it would cost over $ 100,000 to construct one of the wind turbines, Dr. Wilson outlined numerous conceptual problems with the design of the wind turbines, all of which negatively affected their fair market value. Despite the cost to construct a wind turbine, the conceptual problems with the design and the need for a full-time attendant meant that the wind turbines could never have profitably generated electricity. The purchase price of the wind turbines, $ 208,000 each, greatly exceeded their cost of construction and greatly exceeded their fair market value, which we have found to be no more than their salvage value, or approximately $ 3,000. Seventy-five percent of the purchase price of each wind turbine was paid with nonrecourse debt. If the purchase price *449 of an asset purchased with nonrecourse debt greatly exceeds the value of the asset, the nonrecourse debt is not bona fide and will not be recognized for tax purposes because the purchaser is not making a capital investment in the unpaid portion of the purchase price. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Only $ 800 was paid on the $ 150,000 note given by petitioner as part of the purchase price of the Tehachapi wind turbine, and no payment was ever made on the $ 155,000 note given as part of the purchase price of the Cabazon wind turbine. The nonrecourse debt served only to increase the purchase price of the wind turbines and generate increased tax credits and deductions. The illusory nature of the financing convinces us that petitioner's investment in the wind turbines was without economic substance and that the cash portion of the selling price was simply paid for tax benefits. The existence of a highly inflated purchase price based upon deferred debt that is not likely to be paid is an indication of a lack of economic substance. Gilbert v. Commissioner, T.C. Memo. 1987-165, affd. without published opinion. The *450 Trans Power wind turbines were never fully operational, could never have operated profitably, and were not capable of functioning as promoted. Of the more than 50 wind turbines sold to investors, perhaps three ever produced electricity for sale to a utility. All of this leads us to the conclusion that Trans Power was in the business of selling tax deductions and credits and was not engaged in a business the objective of which was to make a profit for its investors. The promotional materials received by petitioner from Shelburne were devoted almost exclusively to the tax benefits of the scheme. Petitioner must have known that the wind turbines would not be placed in service in the years in which they were purportedly purchased, and the tax benefits of the transactions obviously overrode any questions of the profitability of the investment in the machines. It is clear from the record that the purpose of petitioner's involvement in the wind turbine investments was to obtain tax deductions and that the investments were devoid of any economic substance. We sustain respondent's determinations regarding the claimed losses and investment tax credits. Since we have held that the investments *451 were without economic substance, we need not address respondent's alternative arguments. Theft Loss Deduction
Section 165 allows as a deduction any theft loss sustained during the taxable year and not compensated for by insurance or otherwise. Under section 165(e), a theft loss is "sustained during the taxable year in which the taxpayer discovers such loss." Petitioners presented no proof at trial to support a theft loss deduction under section 165(e). Petitioners bear the burden of proof on this issue. Welch v. Helvering, 290 U.S. 111 (1933). Petitioners seem to argue on brief that sustaining respondent's determinations in this case requires us to find that a theft loss necessarily occurred in the taxable years in which they made cash outlays for the wind turbines. Petitioners have not only failed to prove the year or years in which a theft loss was discovered by them, they have failed to present any evidence that they were defrauded. Rather, the record before us indicates that they were willing purchasers of the wind turbines and are simply dissatisfied because they will not realize expected tax benefits. Respondent is thus sustained on this issue. Charitable Contributions Deduction *452 Petitioners alleged in their petition that respondent improperly disallowed $ 16,472 of charitable contributions for 1983. No evidence was presented on this issue at trial, and the issue was not addressed in petitioners' briefs. Accordingly, petitioners have failed to carry their burden of proof on this issue, and respondent's determination as to the charitable contributions deduction will be sustained. Additions to Tax
1. Section 6653(a)
Section 6653(a) provides for an addition to tax "if any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations." We sustain the determination of respondent that petitioners are liable for an addition to tax for negligence for each of the years in issue. Petitioners claimed substantial credits and deductions with respect to a dubious investment after little or no investigation of the merits of the wind turbines. Petitioner was not an engineer, nor did he consult with anyone with knowledge in the field of wind energy. See Beck v. Commissioner, 85 T.C. 557, 577 (1985); Elliott v. Commissioner, 84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Petitioners claimed an *453 inflated basis in the wind turbines for depreciation and credits on their 1981 and 1982 tax returns, when minimal investigation would have revealed that the purchase price of the machines was inflated and that petitioners were not entitled to the deductions and credits. Petitioner's primary investigation of the investment was his own cash-flow analysis, but he simply discounted projections in the prospectus, which explicitly stated that the information should not be relied on by prospective investors. Furthermore, the prospectus specifically noted that the tax benefits of the investment "are not free from doubt" and might be "reduced or entirely eliminated." Petitioners' conduct and omissions thus justify the additions to tax for negligence. 2. Section 6659
Section 6659 imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement." Section 6659(c) provides that: there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). A valuation overstatement of *454 more than 250 percent of the correct valuation or adjusted basis results in the imposition of a 30-percent addition to tax. Sec. 6659(b). On the returns at issue in this case, petitioners reported adjusted bases in the Tehachapi wind turbine and the Cabazon wind turbine of $ 213,000 and 208,000, respectively. We have found that the transactions involving the wind turbines were devoid of economic substance and are to be disregarded for tax purposes. Collins v. Commissioner, 857 F.2d 1383, 1385 (9th Cir. 1988), affg. a Memorandum Opinion of this Court; Sochin v. Commissioner, 843 F.2d 351, 353 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985).Accordingly, petitioners have no "adjusted basis" for purposes of depreciation, the investment credit, or the business energy investment credit. The correct adjusted basis in the wind turbines is therefore zero. See Zirker v. Commissioner, 87 T.C. 970, 978 (1986).Petitioners' valuation overstatement is thus more than 250 percent of the correct valuation and they are liable for the addition to tax under section 6659(b) in the amount of 30 percent of the underpayment attributable to the valuation overstatement. See Roach v. Commissioner, T.C. Memo. 1989-586. *455 3. Section 6661
Section 6661 is applicable only to the amount by which the understatement exceeds the amount of the underpayment attributable to a valuation overstatement as determined under section 6659. Sec. 6661(b)(3); Sec. 1.6661-2(f), Income Tax Regs. As a result of our holding above with respect to the addition to tax under section 6659, further discussion of section 6661 is unnecessary. 4. Section 6621(c)
Section 6621(c) provides for interest at the rate of 120 percent of the normal rate (under section 6601) with respect to any substantial underpayment attributable to a tax-motivated transaction. The term "tax-motivated transaction" includes any valuation overstatement. Sec. 6621(c)(3)(A)(i). Petitioners are therefore liable for additional interest as determined by respondent. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
**. 120 percent of the interest accruing after Dec. 31, 1984, on the entire underpayment of tax.
*. 50 percent of the interest due on the amount of the deficiency.↩