JIMMIE L. and GOLDIE PENIX, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Penix v. Commissioner
Docket Nos. 25919-85, 41225-85, 6182-86, 10110-87, 16546-87, 23727-87
United States Tax Court
T.C. Memo 1991-332; 1991 Tax Ct. Memo LEXIS 383; 62 T.C.M. (CCH) 182; T.C.M. (RIA) 91332; July 22, 1991, Filed *383 Decisions will be entered under Rule 155 in all cases except docket No. 41225-85, and an appropriate order will be issued in that case. James T. Burnes, for the petitioners in docket Nos. 41225-85, 10110-87, 16546-87, and 23727-87. Richard H. Halley, pro se. Shirley M. Francis, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These cases were assigned to Special Trial Judge John J. Pajak pursuant to section 7443A(b) and Rule 180 et seq. [2] (All section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. *384 OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: These six consolidated cases were selected as test cases for the Southampton Music Company master recording program. [3] Respondent determined deficiencies and additions to petitioners' Federal income taxes as follows: Jimmie L. and Goldie Penix
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1979
$ 1,226.00
$ 61.30 --  --
$ 367.80  1980
3,546.00
177.30
--  --
1,063.80
1981
4,110.00
--
$ 205.50
*
1,233.00
1982
4,566.00
--
228.00
*
935.00
1983
837.00
--
41.85
*
--  Robert V. and Merla J. Hale
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1978
$ 1,903.00
$ 98.00 --  --
$ 586.00  1979
2,059.00
103.00
--  --
618.00
1980
4,019.00
201.00
--  --
1,206.00
1981
5,486.00
--  $ 274.00
*
1,646.00
1982
2,308.00
--  115.00
*
649.00
*385 Richard H. and Sonya H. Halley
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1979
$ 10,825.00
$ 541.00
--  --
$ 3,248.00
1980
4,833.00
242.00
--  --
1,450.00
1981
7,795.00
--
$ 390.00
*
2,339.00
1982
16,162.00
--
808.00
*
4,849.00
Ferdinand D. and Karen L. Mehlick
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1980
$ 13,311.00
$ 666.00
--
--
$ 3,993.00
1981
20,485.00
--
$ 1,024.00
*
6,145.00
1982
8,501.00
--
425.00
*
2,550.00
1983
11,544.00
--
577.00
*
3,463.00
*386 Eric H. and Patricia Accomazzo
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1979
$ 12,315.00
$ 615.75
--  --
$ 3,694.50
1980
8,654.00
432.70
--  --
2,596.20
1981
4,282.00
--  $ 214.10
*
1,284.60
1982
17,974.00
--  898.70
*
4,779.90
1983
11,891.00
--  594.55
*
3,546.60
Mike S. and Linda M. Nares
Additions to Tax Under Section
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1980
$ 5,420.00
$ 271.00
--  --
$ 1,626.00
1981
7,648.00
--  $ 382.40
*
2,294.40
1982
5,884.00
--  294.20
*
1,765.20
1983
8,750.00
--  437.50
*
2,625.00
*387 Respondent also determined that petitioners Hale, Halley, Mehlick, Accomazzo, and Nares are liable for the increased rate of interest under section 6621(c) (formerly section 6621(d)), for all tax years at issue. Respondent raised section 6621(c) in an amendment to answer for petitioners Penix for all tax years at issue, but on brief conceded that this section does not apply with respect to their tax year 1983. Respondent also filed a motion for damages (now penalties) under section 6673 for each of the consolidated cases. *388 This Court must decide: (1) Whether petitioners are entitled to expense deductions or partnership losses and investment tax credits related to their respective master recording leases; (2) whether petitioners are liable for the additions to tax under section 6653(a) and under section 6653(a)(1) and (2) in the applicable years; (3) whether petitioners are liable for the additions to tax under section 6659; (4) whether petitioners are liable for the increased interest under section 6621(c); and (5) whether petitioners are liable for damages (now penalties) under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Jimmie L. and Goldie Penix resided in Emmett, Idaho, when they filed their petition. Petitioners Robert V. and Merla J. Hale resided in Port Oxford, Oregon, when they filed their petition. Petitioners Richard H. and Sonya H. Halley resided in Folsom, California, when they filed their petition. Petitioners Ferdinand D. and Karen L. Mehlick resided in Vista, California, when they filed their petition. Petitioners Eric H. and Patricia Accomazzo resided in Moraga, California, when they filed their petition. Petitioners *389 Mike S. and Linda M. Nares resided in Glendora, California, when they filed their petition. In February 1982, Jerry W. Hendricks (Hendricks), Forrest F. Andreason (Andreason), and Bryson R. Reinhardt (Reinhardt) organized Southampton Music Company (formerly known as Sound Leasing Company). Southampton Music Company (Southampton) was formed to acquire master sound and video recordings of artistic productions for leasing to investors. [4]
Hendricks, Andreason, and Reinhardt formed Intrasound Music Company (Intrasound) and Cumberland Productions, Inc., (Cumberland) to acquire title to the master recordings from vendors and then to sell the masters to Southampton. Cumberland also was to produce master recordings. Indigo Music Corporation (Indigo) was formed by Hendricks, Andreason, and Reinhardt to produce records and *390 tapes from the master recordings and/or to distribute the records and tapes. When investors entered into lease agreements with Southampton, Southampton recommended that the investors contract with Indigo for distribution. Southampton sent Indigo lists of such investors. Indigo then solicited distribution agreements from the investors. Intrasound and Cumberland purchased master recordings from various vendors for $ 704 to $ 30,000, and shortly thereafter sold the master recordings to Southampton for $ 400,000 to $ 3,000,000. Sometimes, Southampton purchased the master recordings from Intrasound and Cumberland before the latter had purchased the master recordings. During 1982, Intrasound and Cumberland paid various vendors $ 1,018,203 for master recordings which they then sold to Southampton for a total of $ 110,250,000. During 1983, Intrasound and Cumberland paid a total of $ 621,135 to acquire or produce master recordings which they then sold to Southampton for a total of $ 103,285,000. When Cumberland produced master recordings, its cost was $ 12,500 or less per master recording. Cumberland sold these same master recordings to Southampton for $ 400,000 to $ 1,360,000. Southampton *391 paid for each of the master recordings with a small amount of cash and a large purported promissory note (note). Southampton provided potential investors with promotional booklets. One is a 66-page promotional booklet, entitled "Southampton Music Company: 1982-83 Program." This promotional booklet emphasized the tax benefits of investing in a master recording rather than any economic benefits that could be expected. The booklet included a 37-page tax opinion by Joseph Wetzel, an attorney in Portland, Oregon. The tax opinion discussed the tax benefits of the investment and potential tax problems that could be raised by the Internal Revenue Service and ways to avoid them. Mr. Wetzel's tax opinion was based on the assumption that Southampton would purchase master recordings from unrelated persons or firms in arm's-length transactions. The promotional booklet also contains a chart entitled "Table of Advance Lease Payments and First Year Tax Benefits" with four levels of escalating investments with escalating tax benefits. For example, according to the chart, a cash investment of $ 31,000 in a $ 400,000 master recording would yield in the first year an investment tax credit of $ *392 40,000 and a tax deduction of $ 26,000. The booklet also stated that custom packages of equipment having a higher purchase price were available. Petitioners Penix, Hale, Mehlick, Accomazzo, and Nares became partners in different small partnerships or joint ventures (hereinafter referred to as partnerships) with other investors. In most cases, these petitioners did not meet their respective partners until after signing the lease agreements or only spoke with them on the telephone, or in some instances never spoke with them at all. Petitioners Halley invested as individuals. Petitioners Penix, Hale, and Halley signed master recording leases in 1982. Petitioners Nares and Mr. Mehlick signed master recording leases in 1983. Petitioners Accomazzo signed two master recording leases in 1982 and Mr. Accomazzo signed one in 1983. Each lease was for a different master recording from Southampton. The lease agreements all were for a term of 5 years and 10 months. For each master recording, the following shows the acquisition cost for Intrasound and Cumberland, the price paid by Southampton, and the amount of cash paid by Southampton: Master
Acquisition
Southampton's
Southampton's
Recording
Cost
Purchase
Cash
Price
Payment
Turner Brothers
$ 3,500 $ 400,000  $ 4,250 Andres Segovia
2,000
400,000
6,250
New Dawn
3,500
400,000
4,250
Quinton Stacey
* 1,360,000
22,000
Carter Family
12,296
850,000
10,250
Owen Brothers
12,296
850,000
10,250
Hugh X. Lewis
12,500
1,360,000
22,000
Early Rock
2,500
400,000
4,000
*393 In comparison to the purchase price, Southampton paid Cumberland or Intrasound a very low cash down payment and gave a purported note for the balance. The notes were secured by the respective master recordings and interest was to accrue at 9 percent per year. Under the terms of the note, no payments of interest or principal were due for 12 years and 1 day, except for one-half of the "Gross Receipts, License Fees and Other Income" received on the master recordings by Southampton. (No note for the Owen Brothers master recording was in the record, but it appears that Southampton used the same form for such purposes.) Southampton never made any payments on the notes and no legal action was ever taken against Southampton for nonpayment. The following shows the master recordings leased by petitioners, their percentage interests in the respective partnerships (except for the Halleys who were not involved in a partnership), the investments (including distribution costs) in their respective *394 master recording leases, and the claimed values on their returns for investment tax purposes: Petitioners
Master
Percentage
Investment
Claimed
Recordings
Interest Value
Penix
Turner Brothers
30.0 percent
$ 9,300 $ 120,000
Hale
Andres Segovia
20.0 percent
6,200
80,000
Halley
New Dawn
100.0 percent
31,000
400,000
Mehlick
Quinton Stacey
50.0 percent
39,000
680,000
Accomazzo
Carter Family and
20.9 percent
21,700
355,300
Owen Brothers Accomazzo
Hugh X. Lewis
20.0 percent
15,600
272,000
Nares
Early Rock
70.0 percent
21,700
280,000
Although there are variances in the cases, the transaction was as follows. Generally, petitioners would deduct most of the prepaid rent and distribution costs in the year of investment. Southampton passed to the investors their respective shares of an investment tax credit based upon Southampton's purchase price. The investors claimed these investment tax credits in the year of investment and carried them back to prior taxable years, and one carried an investment tax credit forward to a subsequent taxable year. None of the petitioners had experience in the music or recording industry or in record distribution at *395 the time they entered into the lease agreements for their master recordings. None of the petitioners had training in financial, accounting, or tax matters. They either consulted with no one or only with persons or entities associated with Southampton regarding the operation of a record production business. Some discussed the matter with other Southampton investors. Petitioners did not seek independent appraisals of the master recordings or seek the advice of anyone with experience in the music or recording industry regarding their investments in master recordings. Except for petitioners Mehlick who never saw an appraisal, the only appraisals of the master recordings petitioners read were provided to them by Southampton or its agents. None of the petitioners consulted with an independent tax attorney about the investment and its alleged tax benefits before signing their respective master recording lease agreements. In each case, petitioners did not research the marketability of their respective master recordings. Some of the petitioners were consulted as to the type of music, and in one case the artist they desired, for their respective master recordings, but none knew the *396 selections before they signed their master recording leases. None of the petitioners were provided with their respective master recordings for inspection prior to signing the respective lease agreements. None of the petitioners prepared an income/expense projection for their respective master recordings. They relied on promotional booklets given to various petitioners by the salesmen for Southampton. None of the petitioners checked as to ownership of the title of their respective master recordings. None of the petitioners purchased insurance for their master recordings. Petitioners Hale, Mehlick, Accomazzo, and Nares were unaware of whether their other partners purchased insurance. (The record is silent on this point as to petitioners Penix.) None of the partnerships kept formal records of their alleged business. Petitioners Mehlick, Accomazzo, and Halley kept files of correspondence relating to their master recordings. Petitioners did not negotiate with Southampton regarding the price or the terms of their master recording leases. They all chose Indigo to distribute their master recordings, and none negotiated with Indigo regarding the contract price. All of the petitioners *397 received either none or a small number of records and/or tapes of their respective master recordings. Petitioners Penix: Mr. Penix was a truck driver or logger at the time of the Penixes' investment. These petitioners did not appear at either trial. The Penixes filed Federal income tax returns for 1979 through 1983. On their 1982 return, the Penixes deducted $ 5,550 as a loss from their Southampton partnership. The Penixes claimed $ 12,000 of tentative regular investment credit and used $ 3,118 as an investment tax credit in 1982. They carried back unused investment tax credit in the amounts of $ 1,226, $ 3,546, and $ 4,110 to 1979, 1980, and 1981, respectively. On their 1983 return, the Penixes deducted $ 3,995 as a loss from their Southampton partnership. In a notice of deficiency sent to the Penixes for 1979 through 1983, respondent disallowed the partnership losses of $ 5,500 and $ 3,995 claimed in 1982 and 1983, respectively. Respondent also disallowed the $ 3,118 of investment tax credit taken in 1982, and the $ 1,226, $ 3,546, and $ 4,110 of investment tax credit carried back to 1979, 1980, and 1981, respectively. Petitioners Hale: Mr. Hale, a former United *398 States Air Force officer, was retired at the time of the Hales' investment. Mr. Hale asked that classical music be featured on his master recording. Mr. Hale selected Andres Segovia as his artist because he was internationally known. Mr. Hale did not retain Mr. Richard AuFranc, a friend who was an attorney and a CPA, until after he received notice of an audit from the IRS in September 1983. About the time of his investment in Southampton, Mr. Hale had asked Mr. AuFranc about the necessary requirements for claiming an investment tax credit but did not ask him for an opinion about Southampton because he had made up his mind to invest. Mr. Hale was not pleased with the distribution efforts of Indigo, and he contacted Southampton a number of times, sometimes with Mrs. Hale. The Hales filed Federal income tax returns for 1978 through 1982. The Hales carried over $ 4,782 of unused investment tax credit from another investment to 1982. On their 1982 return, the Hales deducted $ 5,200 as a loss from a Southampton partnership on Schedule E of their return. The Hales twice deducted the $ 5,200 on Schedule C of their 1982 return, listing the amounts as $ 4,000 for rent on business property *399 and $ 1,200 for distribution cost. The Hales claimed $ 8,000 as tentative regular investment credit from their Southampton investment, which when added to the $ 4,782 carry-over and a $ 63 investment credit on other properties, resulted in a tentative regular investment credit of $ 12,845. The Hales listed $ 12,845 as an investment tax credit on their 1982 return and improperly offset $ 334 of tax from recapture of investment credit, the only tax shown as due on that return. In a notice of deficiency sent to the Hales for 1980, 1981, and 1982, respondent disallowed for 1982 the $ 5,200 partnership loss, the $ 4,000 deduction for rent on business property, and the $ 1,200 deduction for distribution cost. Respondent also allowed only the $ 63 investment credit for 1982, thereby disallowing the $ 8,000 investment tax credit attributable to the Southampton investment, as well as the carried-over amount. Respondent sent a separate notice of deficiency to the Hales for 1978 and 1979. Petitioners Halley: Mr. Halley had been a school teacher and principal who retired in 1986. Tax considerations played an important role in the decision to invest in the master recording. The Halleys *400 indicated to the salesman they would be interested in classical music or country-western. The New Dawn master recording assigned to them fit that criteria. Ultimately, Mr. Halley obtained 50 copies of the New Dawn record which were given away to people or local radio stations. Although the Halleys were not satisfied with Indigo's distribution, they neither hired another distributor nor sued Indigo. The Halleys filed their Federal income tax returns for 1979 through 1982. On Schedule C of their 1982 return, the Halleys deducted a loss of $ 20,000 as rent on business property and $ 6,000 as distribution cost, for a total loss of $ 26,000 from their Southampton investment. The Halleys claimed $ 40,000 of tentative regular investment credit for their Southampton investment. In 1982, they used $ 6,611 of investment tax credit attributable to their Southampton investment. The Halleys carried back unused investment tax credit from their Southampton investment in the amounts of $ 10,825, $ 4,833, and $ 7,795 to 1979, 1980, and 1981, respectively. The Halleys had $ 9,936 of unused investment tax credit attributable to their Southampton investment to carry over into later years. In *401 a notice of deficiency sent to the Halleys for 1979, 1980, and 1981, respondent disallowed the $ 10,825, $ 4,833, and $ 7,795 of investment tax credit carried back to 1979, 1980, and 1981, respectively. In a separate notice of deficiency for 1982, respondent disallowed the $ 26,000 loss and the $ 6,611 of investment tax credit attributable to the Southampton investment. Petitioners Mehlick: Mr. Mehlick was employed by Pacific Bell at the time of his investment in 1983. He and a number of Moraga, California, residents met periodically during 1982 and 1983 to discuss investments at a bar and restaurant known as the Moraga Barn. Mr. Mehlick did not invest in Southampton until 1983. One of the other investors, Kenneth Zavala, a Federal Bureau of Investigation (FBI) agent, had conducted a background check of Southampton and told Mr. Mehlick that the investment was a high quality one. Mr. Mehlick wanted country-western as the type of music for his recording. Hendricks and his father-in-law, Robert Amber, selected the master recording for Mr. Mehlick's investment. Beginning on July 22, 1984, Mr. Mehlick wrote letters to Southampton to follow up on his investment in a master recording *402 asking about the background of Quinton Stacey, a breakdown of money to be spent on production and advertising, and the goals for this recording for 1984 and subsequent years concerning potential revenue, costs, and profits per year, assessment of the master recording videotape market, and identification of major customers or competitors. He received some generalized responses and never received a promised appraisal of his recording. Petitioners Mehlick filed a partnership return with three others but they do not have, nor did they ever request or receive a copy of the partnership return. The Mehlicks filed their Federal income tax returns for 1980 through 1983. On Schedule C of their 1983 return, the Mehlicks deducted $ 8,320 of the rent on business property as a loss from their Southampton investment. The Mehlicks claimed $ 68,000 of tentative regular investment credit, and used $ 8,488 of investment credit in 1983. The Mehlicks carried back unused investment tax credit in the amounts of $ 13,311, $ 20,485, and $ 8,501 to 1980, 1981, and 1982, respectively. The Mehlicks had $ 17,215 of unused investment tax credit to carry over into later years. In a notice of deficiency *403 sent to the Mehlicks for 1980, 1981, 1982, and 1983, respondent disallowed the $ 8,320 loss claimed in 1983. Respondent also disallowed the $ 8,488 of investment tax credit taken in 1983 and the $ 13,311, $ 20,485, and $ 8,501 of investment tax credit carried back to 1980, 1981, and 1982, respectively. Petitioners Accomazzo: Mr. Accomazzo, who had attended high school, was in the service station business at the time of the investments in Southampton. He and a number of Moraga, California, residents (including petitioner Ferdinand Mehlick) invested in Southampton. They would meet periodically at a local bar and restaurant known as the Moraga Barn to discuss investments. One of them, Kenneth Zavala, an FBI agent, on his own behalf, ran a criminal check on the president of Southampton and made inquiries of a California corporation licensing section in Sacramento, the Better Business Bureau and the California Bar Association. Prior to Mr. Accomazzo's investment in 1983 (but not before the 1982 investment), Mr. Zavala told Mr. Accomazzo the corporation was solvent and had no problems. The initial source of Mr. Accomazzo's funds for investment in Southampton was bank savings. *404 The Accomazzos filed Federal income tax returns for the taxable years 1979 through 1983. On their 1982 return, the Accomazzos deducted $ 4,200 as distribution cost and $ 14,045 as rent. These expenses were attributable to their Southampton investment, but they commingled them among the Schedule C expenses for Mr. Accomazzo's service station. The Accomazzos claimed $ 35,530 of tentative regular investment credit from their 1982 Southampton investment. In 1982, they used $ 7,975 of the investment tax credit attributable to their Southampton investment. The Accomazzos carried back unused tax investment credit in the amounts of $ 12,315, $ 8,654, and $ 4,282 to 1979, 1980, and 1981, respectively. They carried over $ 2,304 of unused investment tax credit to 1983. This carry-over and these carry-backs totaled $ 35,530 of the investment tax credit from the Accomazzos' 1982 Southampton investment. On their 1983 return, the Accomazzos deducted $ 10,400 as a Southampton partnership loss and $ 578 as Southampton interest. The Accomazzos also deducted rent of $ 3,511 attributable to their Southampton investment, which they commingled among the Schedule C expenses for Mr. Accomazzo's *405 service station. The Accomazzos claimed an additional $ 27,200 of tentative investment credit attributable to their 1983 Southampton investment. In 1983, the Accomazzos used $ 6,720 of the investment tax credit attributable to their Southampton investments, leaving a balance of $ 22,784 of unused investment tax credit from the 1983 Southampton investment to carry over into later years. In a notice of deficiency sent to the Accomazzos for 1979, 1980, and 1981, respondent disallowed the $ 12,315, $ 8,654, and $ 4,282 of investment tax credit carried back to 1979, 1980, and 1981, respectively. In a separate notice of deficiency for 1982 and 1983, respondent disallowed for 1982 the $ 4,200 distribution cost deduction, the $ 14,045 rent deduction, and the $ 7,975 of investment tax credit attributable to their Southampton investment. Respondent also disallowed for 1983 the $ 10,400 partnership loss, the $ 578 interest deduction, the $ 3,511 rent deduction, and the $ 6,720 of investment tax credit attributable to their Southampton investments. Petitioners Nares: Mr. Nares was a systems analyst for the City of Los Angeles Fire Department when the Nares invested in Southampton. Mr. *406 Nares requested that he be provided with a rock-and-roll master recording because he believed such music would be in demand. In order to finance his investment in Southampton, Mr. Nares borrowed $ 21,000 from his bank secured by a lien against his residence. Mr. Nares' personal accountant knew nothing about master recordings and did not give the Nares an opinion before or after they signed their lease agreement as to whether they were entitled to the claimed deductions and credits, or whether they had a bona fide profit objective, or whether there was any substance to Southampton. The accountant relied on the Nares for the documents which supplied the figures he put on their returns. Mr. Nares neither provided a personal computation of a break-even point nor the number of sales required to make such a computation. Mr. Nares filed a 1983 partnership return with respect to the master recording, but the Nares used a Schedule C attached to their 1983 return to report their master recording deductions. The Nares filed Federal income tax returns for 1980 through 1983. On Schedule C of their 1983 return, the Nares deducted $ 40 in advertising, $ 205 in car and truck expenses, $ 2,540 *407 as interest on business indebtedness, $ 11,667 as master recording rent, $ 250 as loan costs, and $ 4,200 as distribution costs for a total loss of $ 18,902 from their Southampton investment. On their 1983 return, the Nares claimed $ 28,000 of tentative regular investment credit, and used $ 3,363 as an investment tax credit. The Nares carried back unused investment tax credit in the amounts of $ 5,420, $ 7,648, and $ 5,884 to 1980, 1981, and 1982, respectively. The Nares had available $ 5,685 of unused investment tax credit to carry over into later years. In a notice of deficiency sent to the Nares for 1980, 1981, 1982, and 1983, respondent disallowed the $ 18,902 Schedule C loss claimed for 1983. Respondent also disallowed the $ 3,363 of investment tax credit taken in 1983, and the $ 5,420, $ 7,648, and $ 5,884 of investment tax credit carried back to 1980, 1981, and 1982, respectively. OPINION The first issue is whether petitioners properly claimed either expense or loss deductions and investment tax credits with respect to their investments in master recording leases either individually or through partnerships. [5]
*408 Petitioners bear the burden of establishing they are entitled to the claimed deductions and credits. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). It is well settled that, where a transaction is entered into without any purpose other than to obtain tax benefits, the form of the transaction will be disregarded and the tax benefits denied. Law v. Commissioner, 86 T.C. 1065, 1093 (1986). It is also well settled that a transaction must have economic substance which is encouraged by business realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). As a threshold matter, a reasonable opportunity for economic profit exclusive of tax benefits must exist before a transaction will be recognized for tax purposes. Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). We focus on the transactions in their entirety in determining whether they lack economic substance. These cases are factually similar to other cases decided by this Court in which deductions *409 and credits related to master recordings were disallowed. Rybak v. Commissioner, 91 T.C. 524 (1988); Morrissey v. Commissioner, T.C. Memo 1989-646. In those cases we analyzed the objective factors and concluded that the transactions lacked economic substance. Likewise, if we conclude the transactions in issue lack economic substance, they will be disregarded for Federal income tax purposes. Collins v. Commissioner, 857 F.2d 1383, 1385 (9th Cir. 1988), affg. a Memorandum Opinion of this Court; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). We first must decide whether tax motivation is apparent in the transactions. If tax motivation is apparent, we then must decide whether a significant business purpose existed for the taxpayers to obtain the claimed benefits. Patin v. Commissioner, 88 T.C. 1086, 1116 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *410 affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Indicia of tax motivation are: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * *
Rose v. Commissioner, 88 T.C. 386, 412 (1987), affd. 868 F.2d 851 (6th Cir. 1989). The transactions in the instant cases clearly indicate obvious tax motivation because the promotional booklets emphasized the tax benefits investors could obtain; petitioners executed leases and distribution agreements without price negotiation; the master recordings were grossly overvalued; the *411 master recordings were purchased by Southampton shortly before the transactions in question for negligible amounts; and the bulk of the consideration was deferred by notes non-recourse in substance. Since we have concluded that petitioners' transactions were tax motivated, we must decide whether petitioners' investments in the Southampton program lack economic substance and should be disregarded for Federal income tax purposes. Factors to be considered include: (1) Lack of arm's-length dealings between petitioners and the promoters, (2) relationship between fair market value and price, and (3) petitioners' investment activities. Patin v. Commissioner, 88 T.C. at 1117-1124; Rose v. Commissioner, 88 T.C. at 415-422. The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. Rose v. Commissioner, 88 T.C. at 416; Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. without published opinion 860 F.2d 1075 (3rd Cir. 1988). Southampton's promoters, Hendricks, Andreason, and Reinhardt, formed Intrasound and Cumberland, from which Southampton *412 allegedly purchased the master recordings. Southampton recommended only Indigo, also formed by Hendricks, Andreason, and Reinhardt, to the investors as a production/distribution company. There was a lack of arm's-length dealings between Intrasound/Cumberland and Southampton, and between Southampton and Indigo. These entities were created to structure tax write-offs for sale to investors. Petitioners did not negotiate with Southampton regarding any of the terms of their master recording leases nor with Indigo regarding any of the terms of the production/distribution contracts. There were no arm's-length negotiations between petitioners and Southampton or Indigo. Petitioners paid the requested amounts to get the substantial deductions and credits offered under the Southampton program. The prices for the master recordings claimed by petitioners were grossly exaggerated. The quick sale of the master recordings from Intrasound and Cumberland to Southampton inflated the claimed value of the master approximately 65 to 200 times the price paid by Intrasound and Cumberland. Petitioners offered no evidence of any circumstances which caused the claimed increases in value. The purported *413 purchase prices paid by Southampton were largely financed by notes payable for 12 years and 1 day from income from the master recordings purchased for nominal amounts. No payments on the notes were ever made by Southampton and no legal action was ever taken against Southampton for nonpayment. "If we cannot conclude at the outset of the transaction that payment of the note is likely, then the note is too contingent to be recognized for tax purposes." Waddell v. Commissioner, 86 T.C. 848, 904 (1986), affd. 841 F.2d 264 (9th Cir. 1989). We believe there never was any intent to make payments on these Southampton notes, and they are not to be recognized for tax purposes. Thomas Bonetti, the president and owner of Cumpari Inc., Celebrity Licensing Inc., and Janus Records Inc., testified as an expert witness for respondent. Mr. Bonetti had about 30 years of experience in the recording and music industries. Mr. Bonetti is an expert in appraising master recordings. Mr. Bonetti used the potential stream of income approach to value the recordings. He considered the artist, the material, the packaging, and the production and engineering. He also synthesized *414 information obtained from other sources in the recording industry. Mr. Bonetti appraised the total potential profit for six of the seven master recordings on an optimistic approach, without amortizing for acquisition costs or discounting to present values, as follows: Master Recording
Potential Profit
Carter Family
less than
$ 15,000.00
Owen Brothers
less than
3,000.00
New Dawn
less than
3,000.00
Andres Segovia
less than
8,000.00
Hugh X. Lewis
7,500.00
Turner Brothers
less than
7,500.00
Quinton Stacey
3,000.00
Petitioners offered into evidence an appraisal of Leo de Gar Kulka, president of Kulka, Inc. Mr. Kulka had over 30 years of experience in the recording and music business. Kulka appraised the following master recordings: Andres Segovia, Carter Family, Hugh X. Lewis, New Dawn, Turner Brothers, and Owen Brothers. Mr. Kulka was asked to research and appraise the above master recordings 4 days prior to the due date of the report. Mr. Kulka projected sales by comparing the recordings with artists he believed were of similar vintage. Mr. Kulka made numerous assumptions of how the master recordings would be packaged and marketed, without any evidence that *415 petitioners actually followed these assumptions. Mr. Kulka could not provide an appraisal for New Dawn, Turner Brothers, and Owen Brothers, due to a lack of knowledge about the artists and their past activities. Mr. Kulka projected total product sales expectancy over a 5-year period for three of the master recordings as follows: Master Recording
Pre-Tax Net Profit
Andres Segovia
$ 381,150.00
Carter Family
278,966.50
Hugh X. Lewis
248,422.24
We find Mr. Bonetti's appraisals most credible and persuasive. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). Further, we give no credence to Mr. Kulka's estimated unit sales potential of the master recordings. His estimates were so exaggerated as to be unbelievable. Chiu v. Commissioner, 84 T.C. 722, 730 (1985); Dean v. Commissioner, 83 T.C. 56, 75 (1984); Fuchs v. Commissioner, 83 T.C. 79, 99 (1984). We find that the values of the master recordings are no more than that appraised by respondent's expert, and the values of petitioners' shares are as follows: Actual Fair Petitioners'
Petitioners
Master Recording
Market Value
Share
Accomazzo
Carter Family
$ 15,000
$ 3,135
Owen Brothers
3,000
627
Hugh X. Lewis
7,500
1,500
Hale
Andres Segovia
8,000
1,600
Halley
New Dawn
3,000
3,000
Mehlick
Quinton Stacey
3,000
1,500
Nares
Early Rock
*3,000
2,100
Penix
Turner Brothers
7,500
2,250
*416 We further conclude that the prices paid by Southampton and by petitioners grossly exceeded the actual fair market values of the master recordings. Petitioners' actions indicate a lack of serious investment activity. Petitioners who had partnerships had limited or no knowledge of the other partners. None of the petitioners had experience in the recording industry or in record distribution. Petitioners failed to investigate whether their respective partners had any similar experience. Petitioners lacked any experience in financial, accounting, or tax matters, yet failed to obtain independent consultation on these matters regarding their investments. Petitioners relied solely on appraisals provided by Southampton and never questioned the value determined by the appraisers. Petitioners did not conduct their activities in a way to show that a business existed. Petitioners *417 failed to research the marketability of their respective master recordings, to inspect their master recordings prior to investing, and to confirm ownership of the title of the master recordings. No formal records were kept by petitioners evidencing an ongoing business and none of the petitioners prepared income/expense projections for their master recording activities. Petitioners accepted Southampton's prices for the master recordings and Indigo's prices for production/distribution, without any negotiation. In essence, petitioners accepted all terms presented by the Southampton promoters, looking only at the tax benefits set out in the promotional booklets. Petitioners' only interest was to obtain potential tax savings. In an analogous case involving book manuscripts, Barnard v. Commissioner, 731 F.2d 230, 232 (4th Cir. 1984), affg. Fox v. Commissioner, 80 T.C. 972 (1983), the Court of Appeals commented: The long and the short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of *418 any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path; [Fn. ref. omitted.] if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. * * *
Based upon the foregoing analysis, we hold that petitioners' investments in the Southampton program are devoid of economic substance and were entered into solely for the income tax benefits. The investments are to be disregarded for Federal income tax purposes. We uphold respondent's disallowances as to the expense and loss deductions, the investment tax credits, and the investment tax carrybacks and carryover claimed with respect to the Southampton program. In view of our holdings, we need not discuss any alternative argument raised by respondent. Additions to Tax Section 6653
Sections 6653(a) and 6653(a)(1), as applicable, impose additions to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2), in the years applicable, *419 imposes an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. For the purposes of these sections, negligence is the failure to use due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct, and petitioners bear the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). It was petitioners' reliance upon the purported values of the master recordings and factual statements made by Southampton and its agents that generated the investment tax credits and deductions in these cases. The purported value of the master recordings is the very thing that petitioners in these cases did not verify. See Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), *420 affd, without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). See also Rybak v. Commissioner, 91 T.C. 524, 565-566 (1988). At the supplemental trial, we heard from five of the six sets of petitioners (there was no appearance by petitioners Penix) and have detailed our findings of fact. Basically, petitioners relied upon the promotional information furnished by Southampton, including the appraisals, and the tax opinion letter by Mr. Joseph Wetzel. Mr. Wetzel's letter advised persons like petitioners to seek their own tax adviser and observed that the Internal Revenue Service "will challenge some, many, or all of the tax benefits which a lessee claims." None of the petitioners consulted with an independent tax attorney about the investment and its alleged tax benefits before signing their respective master recording leases. Petitioners did not try to get *421 independent appraisals of the master recordings or seek the advice of anyone with experience in the music or recording industry. Under these circumstances, petitioners' actions were not reasonable and prudent, and the underpayments of tax attributable to the Southampton claims were due to negligence. Accordingly, the additions to tax under sections 6653(a) and 6653(a)(1) are sustained in full and the additions to tax under section 6653(a)(2) are sustained as to the underpayments due to negligence. Section 6659
We next consider whether petitioners are liable for the addition to tax determined under section 6659 for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. Sec. 6659(a) and (b). The underpayment attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). In McCrary v. Commissioner, 92 T.C. 827 (1989), *422 and Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), this Court concluded that the tax liability was not attributable to a valuation overstatement by application of the formula whereby the underpayment for purposes of section 6659 is computed only after taking into account other proper adjustments. The same formula was applied by the Ninth Circuit, the circuit to which an appeal would lie in most of the dockets in this case, in Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. a Memorandum Opinion of this Court, where the parties stipulated that the item in issue had not been placed in service during the taxable year in issue. McCrary involved a master recording lease program where the taxpayers had conceded prior to trial that they were not entitled to the investment tax credit because the agreement was a license and not a lease. In the instant cases, after the original trial and after respondent filed his brief and after petitioners Hale, Mehlick, Accomazzo, and Nares filed their brief on the deficiency issues, those petitioners in a letter from their counsel to respondent, offered *423 to concede that the leases were tantamount to licenses and petitioners Hale offered to concede that their master recording was not placed in service in the year in which the credits were claimed, and therefore all those petitioners would concede the investment tax credit issue. These offers of concession were made shortly before the supplemental trial on the additions to tax, and respondent refused these belated concessions because, among other things, the issues relating to the deficiencies for these test cases had been tried at the original trial. At the supplemental trial, these offers of concession solely on the investment credit issue were again made by counsel on behalf of those petitioners. Respondent again made clear that respondent rejected such concessions. We agreed with respondent and concluded that we would not accept such concessions. Those petitioners had ample opportunity to concede those issues prior to the filing of their post-trial brief on the deficiency issues. (Those petitioners in their reply brief refer to the fact that Todd and McCrary were raised in their supplemental pretrial memorandum. That memorandum was not received and filed by the Court *424 until more than 6 weeks after their post-trial brief.) It is obvious that these concessions were offered in an attempt to avoid the additions to tax under section 6659 under the formula applied in Gainer, McCrary, and Todd. We have previously declined to accept similar concessions. Morrissey v. Commissioner, T.C. Memo 1989-646; Pacheco v. Commissioner, T.C. Memo 1989-296; Looney v. Commissioner, T.C. Memo 1988-332. We detailed in our findings of fact that petitioners made investments of $ 6,200 to $ 39,000 and claimed values of $ 80,000 to $ 680,000 for investment tax credit purposes. Where, as here, a transaction lacks economic substance, the taxpayer takes a zero basis in the asset upon which the taxpayer claims entitlement to investment tax credit. Zirker v. Commissioner, 87 T.C. 970, 978 (1986). Petitioners' claims of investment tax credits are attributable to an asset in which they had no basis. Because petitioners overvalued their respective master recordings for more than 250 percent, petitioners are liable for the section 6659 additions to tax for valuation overstatements *425 attributable to the disallowed investment tax credits and their carrybacks and carryover at the rate of 30 percent of the underpayments of tax attributable to the disallowed investment tax credits. [6]
Deductions of rental, distribution costs, interest, and related expenses were not dependent upon a determination of basis or fair market value. Disallowance of these expenses does not support a section 6659 addition to tax. Soriano v. Commissioner, 90 T.C. 44, 61-62 (1988); Zirker v. Commissioner, 87 T.C. at 980-981. *426 Section 6621(c)
Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6601 if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more "tax motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Among the transactions enumerated in the statute as "tax motivated" is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). Transactions, such as those entered into by petitioners with Southampton, which lack economic substance or business purpose, are sham transactions under section 6621(c)(3)(A)(v). McCrary v. Commissioner, 92 T.C. at 857; Patin v. Commissioner, 88 T.C. at 1128-1129. Therefore, to the extent the disallowed Southampton claims exceed $ 1,000, section 6621(c) would be applicable. Section 6673
Lastly, we consider respondent's motions for the *427 imposition of penalties under section 6673. That section provides for a penalty not to exceed a stated amount (now $ 25,000) to the United States when it appears to the Tax Court that proceedings before it have been instituted or maintained primarily for delay, that the taxpayer's position in such proceedings is frivolous or groundless or that the taxpayer unreasonably failed to pursue available administrative remedies. Respondent argues that such imposition of a penalty is appropriate here because these cases involve an abusive tax shelter scheme. We do not absolve petitioners from their obligation to look behind the benefits promised in the offering materials. However, in the exercise of our discretion, and on this record, we decline to impose penalties in these cases, and respondent's motions will be denied. Serious consideration of the application of the penalty provisions of section 6673 can be expected in future cases involving similarly situated taxpayers. Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert V. and Merla J. Hale, docket No. 41225-85; Richard H. and Sonya H. Halley, docket No. 6182-86; Ferdinand D. and Karen L. Mehlick, docket No. 10110-87; Eric H. and Patricia Accomazzo, docket No. 16546-87; and Mike S. and Linda M. Nares, docket No. 23727-87.↩
2. Trial of these cases was held before Special Trial Judge Hu S. Vandervort. John W. Andrews represented all of the petitioners at the trial. Subsequently, the cases were reassigned to Special Trial Judge John J. Pajak. John W. Andrews was withdrawn as counsel by Orders of the Court. A supplemental trial on the additions to tax and damages (now penalties) issues was held before Special Trial Judge Pajak↩.
3. All issues relating to petitioners Penix, Halley, Mehlick, and Nares arose from petitioners' investments in the Southampton Music Company master recordings. Petitioners Accomazzo conceded issues of unreported income for 1982. Issues unrelated to the Southampton program in petitioners Hales' case were severed prior to the trial of this case, and only a medical expense issue remains unresolved. Our discussion herein will be limited to petitioners' claimed Southampton deductions and credits and the pertinent disallowances by respondent, unless otherwise indicated.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 4,110.00, $ 4,566.00, and $ 837.00, respectively.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 5,486.00 and $ 2,308.00, respectively.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 7,795.00 and $ 16,162.00, respectively.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 20,485.00, $ 8,501.00, and $ 11,544.00, respectively.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 4,282.00, $ 16,763.00, and $ 11,891.00, respectively.↩
*. 50 percent of the interest due on the underpayments due to negligence of $ 7,648.00, $ 5,884.00, and $ 8,750.00, respectively.↩
4. Use of terms such as "lease," "invest," "acquire," and "price" should not be construed as carrying any conclusion as to the actual substance or legal effect of the documents or transactions described.↩
*. Not disclosed in the record.↩
5. Even though Mr. James T. Burnes does not represent petitioners Halley in docket No. 6182-86, in his brief filed on behalf of those petitioners he does represent, Mr. Burnes asserts that the notices of deficiency sent to the Halleys are invalid under Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983). Because an appeal of the Halleys' case lies with the Ninth Circuit, we deem it appropriate to address this assertion. First, neither the Halleys' then counsel nor Mr. Richard H. Halley, who was a witness at the original trial, ever raised this assertion. Mr. Halley did not raise any such assertion at the supplemental trial. Second, we believe the facts in the Halley case distinguish it from those in the Scar case. In Scar v. Commissioner, 814 F.2d at 1368↩, the Ninth Circuit concluded that: "the Commissioner must consider information that relates to a particular taxpayer before it can be said that the Commissioner has 'determined' a 'deficiency' in respect to that taxpayer." [Footnote omitted.] As can be seen in our findings of fact, the disallowances related exactly to the amounts claimed by the Halleys. The notices of deficiency refer to the amounts of taxable income shown on the Halleys' returns and state that the adjustments were discussed with the Halleys' then representative. The only error is a reference to "CHILDREN'S CLASSICS/MPO TRUST (Master Recording only)" on a schedule in each of the two notices of deficiency. The Halleys and their then representative were not misled by what appears to be an identical typographical error in the two notices of deficiency, which considered information that related to the Halleys and made the deficiency determinations in issue.
*. Because no evidence was presented, in the context of this case we find that Early Rock had an actual fair market value of no more than $ 3,000.00↩
6. Section 6659 applies for returns filed after December 31, 1981. Although some petitioners filed returns for 1979, and some petitioners filed returns for 1980 prior to December 31, 1981, they are liable for the additions to tax under section 6659 because the underpayments of tax for those years are attributable to the carryback of unused investment tax credits claimed on the returns for the year 1982 and/or 1983, as relevant to the particular petitioners. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).